No. 20-3151

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

ROBERTO MATA,
*Petitioner-Appellant,*

*v.*

CHRISTINE BRANNON,
*Respondent-Appellee.*

Appeal from a Judgment of the Northern District of Illinois
Case No. 1:12-cv-01376

# APPELLANT'S OPENING BRIEF AND SPECIAL APPENDIX

Michael Rayfield
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500

*Counsel for Petitioner-Appellant*

## DISCLOSURE STATEMENT

I, the undersigned counsel of record for the petitioner-appellant, Roberto Mata, furnish the following list in compliance with Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rules.

1) The full name of every party that the attorney represents in the case:

    Roberto Mata; this party is not a corporation.

2) The names of all law firms whose partners or associates have appeared for the party in the case, or are expected to appear for the party in this Court:

    Michael Rayfield
    Mayer Brown LLP
    1221 Avenue of the Americas
    New York, NY 10020
    (212) 506-2500

3) This is neither a criminal nor a bankruptcy case.


Dated: April 28, 2022                    /s/ Michael Rayfield

                                          Michael Rayfield
                                          Mayer Brown LLP
                                          1221 Avenue of the Americas
                                          New York, NY 10020
                                          (212) 506-2500

# TABLE OF CONTENTS

INTRODUCTION ................................................................................ 1

JURISDICTIONAL STATEMENT ..................................................... 5

ISSUES PRESENTED FOR REVIEW ................................................ 5

STATEMENT OF THE CASE .............................................................. 5

    A.    Mata's Arrest And Videotaped Confession ............................. 6

    B.    Pretrial Suppression Proceedings ......................................... 10

        1.    Mata's Motion To Suppress ........................................ 10

        2.    Hearing On The State's Warrantless Entry ............... 11

        3.    Defense Counsel's Abandonment Of Mata's Motion ................. 13

    C.    Trial .................................................................................... 14

        1.    The State's Case .......................................................... 15

        2.    Mata's Defense ............................................................ 17

        3.    Closing Arguments ...................................................... 20

        4.    Verdict, Post-Trial Motions, And Sentence ............... 21

    D.    Direct Appeal ...................................................................... 22

    E.    Post-Conviction Petition In Circuit Court ............................ 22

    F.    Post-Conviction Appeal ....................................................... 23

    G.    Habeas Petition .................................................................. 25

    H.    Certificate Of Appealability ................................................ 27

STANDARD OF REVIEW .................................................................. 27

SUMMARY OF ARGUMENT ............................................................. 28

ARGUMENT ...................................................................................... 29

I.    Mata's Ineffective Assistance Claim Should Be Decided On The Merits ...... 29

    A.    Mata's Claim Is Not Procedurally Barred Because The State Court Did Not Provide An Adequate Ground For Its Decision ........... 30

    B.    Any Procedural Default Is Excused For Good Cause By Appellate Counsel's Ineffectiveness ....................................... 34

II.  The State Court's Decision On Mata's Ineffective Assistance Claim
     Was Based On An Unreasonable Application Of Clearly Established
     Supreme Court Precedent........................................................................ 36

     A.   Defense Counsel's Performance Was Deficient Because He Did
          Not Pursue Mata's Motion To Suppress The Video Confession .......... 37

          1.   Counsel's Abandonment Of The Suppression Motion Was
               Not Grounded In Any Relevant Strategy .................................. 37

               a.   Counsel Let The Motion Slip Through The Cracks........ 38

               b.   Counsel Did Not Articulate A Strategy .......................... 39

          2.   The Suppression Motion Was Likely To Succeed...................... 41

     B.   Mata Was Prejudiced By Counsel's Deficient Performance ................. 45

CONCLUSION........................................................................................... 46

# TABLE OF AUTHORITIES

**Cases**

*Bell v. Miller,*
    500 F.3d 149 (7th Cir. 2007) ................................................................. 37

*Blackmon v. Williams,*
    523 F.3d 1099 (7th Cir. 2016) ............................................................... 45

*Carrion v. Butler,*
    835 F.3d 764 (7th Cir. 2016) ................................................................. 41

*Carter v. Thompson,*
    690 F.3d 837 (7th Cir. 2012) ................................................................. 41

*Coleman v. Thompson,*
    501 U.S. 722 (1991) .............................................................................. 35

*Dassey v. Dittmann,*
    877 F.3d 297 (7th Cir. 2017) ................................................................. 28

*Davis v. Lambert,*
    388 F.3d 1052 (7th Cir. 2004) ............................................................... 40

*Davis v. North Carolina,*
    384 U.S. 737 (1996) .............................................................................. 42

*Estelle v. McGuire,*
    502 U.S. 62 (1991) .......................................................................... 33, 34

*Franklin v. Gilmore,*
    188 F.3d 877 (7th Cir. 1999) ....................................... 3, 4, 30, 33, 34

*Gilbert v. Merchant,*
    488 F.3d 780 (7th Cir. 2007) ................................................................. 45

*Hadley v. Holmes,*
    341 F.3d 661 (7th Cir. 2003) ................................................................. 27

*Harris v. Reed,*
    894 F.2d 871 (7th Cir. 1990) ...................................................... 4, 37, 40

*Haynes v. State of Wash.,*
    373 U.S. 503 (1963) .............................................................................. 43

*James v. Kentucky,*
    466 U.S. 341 (1984) ................................................................ 30

*Janusiak v. Cooper,*
    937 F.3d 880 (7th Cir. 2019) ................................................... 41

*Johnson v. Pollard,*
    559 F.3d 746 (7th Cir. 2009) ................................................... 41

*Julian v. Bartley,*
    495 F.3d 487 (7th Cir. 2007) ................................................... 45

*Kimmelman v. Morrison,*
    477 U.S. 365 (1986) ................................................................ 37

*Lee v. Davis,*
    328 F.3d 896 (7th Cir. 2003) ................................................... 35

*Lentz v. Kennedy,*
    967 F.3d 675 (7th Cir. 2020) ................................................... 43

*Miranda v. Leibach,*
    94 F.3d 984 (7th Cir. 2005) ............................................... 30, 34

*Mosley v. Atchison,*
    689 F.3d 838 (7th Cir. 2012) ............................................ 37, 38

*Murray v. Carrier,*
    477 U.S. 478 (1986) ......................................................... 34, 35

*People v. Bew,*
    228 Ill. 2d 122 (2008) ...................................................... 31, 32

*People v. Erickson,*
    161 Ill. 2d 82 (1994) ........................................................ 31, 32

*People v. Hodges,*
    234 Ill. 2d 1, 10, (2009) .......................................................... 33

*People v. Kokoraleis,*
    159 Ill. 2d 325 (1994) ............................................................. 31

*People v. Ligon,*
    365 Ill. App. 3d 109 (2006) .................................................... 30

*People v. Parker,*
    344 Ill. App. 3d 728 (2003) .................................................... 30

iv

*People v. Phillips.*
    383 Ill. App. 3d 521 (2008) .................................................................. 4, 30, 31, 34

*People v. Smith,*
    326 Ill. App. 3d 831 (2001) .............................................................................. 38, 39

*People v. West,*
    187 Ill. 2d 418 (1999) ........................................................................... 4, 31, 32, 34

*Peterson v. Douma,*
    751 F.3d 524 (7th Cir. 2014) .................................................................................. 27

*Pole v. Randolph,*
    570 F.3d 922 (7th Cir. 2009) .................................................................................. 41

*Reck v. Pate,*
    367 U.S. 433 (1961) .......................................................................................... 41, 42

*Rhodes v. Dittmann,*
    903 F.3d 646 (7th Cir. 2018) .................................................................................. 28

*Rompilla v. Beard,*
    545 U.S. 374 (2005) .................................................................................................. 37

*Schneckloth v. Bustamonte,*
    412 U.S. 218 (1973) .................................................................................................. 41

*Sornberger v. City of Knoxville,*
    434 F.3d 1006 (7th Cir. 2006) ................................................................................ 43

*Strickland v. Washington,*
    466 U.S. 668 (1984) ........................................................................................*passim*

*Thomas v. Williams,*
    822 F.3d 378 (7th Cir. 2016) .................................................................................. 30

*United States v. Gilliam,*
    255 F.3d 428 (7th Cir. 2001) ............................................................................ 30, 31

*United States v. Huerta,*
    239 F.3d 865 (7th Cir. 2001) ............................................................................ 41, 42

*United States v. Rivera,*
    89 F. Supp. 3d 376 (E.D.N.Y. 2015) ..................................................................... 42

*United States v. Sturdivant,*
    796 F.3d 690 (7th Cir. 2015) .................................................................................. 42

*Weaver v. Nicholson*,
    892 F.3d 878 (7th Cir. 2018) ................................................................ 28

*Wiggins v. Smith*,
    539 U.S. 510 (2003) ............................................................................ 28

*Williams v. Washington*,
    59 F.3d 673 (7th Cir. 1995) ........................................................... 37, 39

## Statutes

28 U.S.C. § 2241 ..................................................................................... 34

28 U.S.C. § 2253(c) .................................................................................. 5

28 U.S.C. § 2254 ............................................................................. *passim*

## Other Authorities

Cir. Rule 30(a) ......................................................................................... 5

Cir. Rule 30(b) ......................................................................................... 5

## INTRODUCTION

Roberto Mata was convicted of murder and aggravated battery in Illinois state court.  At trial, the prosecution relied heavily on incriminating statements that Mata made to the authorities after they swarmed his home, dragged him down a flight of stairs, detained him for 27 hours, interrogated him without *Miranda* warnings, handcuffed him to a wall between interrogations, and threatened multiple members of his family.  Mata's trial lawyer filed a motion to suppress these statements—but remarkably, based on no apparent strategy, he failed to get a *ruling* on that motion.  Then, when Mata argued in a post-conviction proceeding that his counsel was ineffective, the state court rejected this claim because he had not raised it on direct appeal—even though the Illinois courts have held that such claims are not *properly* raised on direct appeal under these exact circumstances.  Adopting the state court's rationale, the district court denied Mata's petition for writ of habeas corpus under 28 U.S.C. § 2254.  This Court should reverse.

In 2002, Mata was arrested for a shooting in Chicago.  He confessed to the shooting on a videotape recorded by state authorities.  But the video told only a fraction of the story.  When the police arrested Mata, they slammed him against the wall, dragged him down the stairs outside his home, repeatedly "pushed" and "poked" him, and forced him to consent to a home search while he was face down on the trunk of a police car.  He was then detained for 27 hours.  During that time, the police and an Assistant State's Attorney (ASA) interrogated Mata several times without *Miranda* warnings in a small room with no windows.  Between interviews, Mata was forced to stand handcuffed to a wall.  The police threatened to arrest his fiancée and

to have his 13-month-old daughter taken away by the Department of Child and Family Services.  Mata was not even given the chance to say what happened in his own words; instead, he was ordered to accept or deny statements formulated by the ASA.  These extraordinary tactics *should* have made Mata's confession worthless.

And at first, Mata's lawyer reacted appropriately.  He filed a motion to suppress the videotaped statements, arguing that they had been obtained in violation of the Fifth Amendment.  Separately, counsel argued that other evidence needed to be suppressed because the officers had searched Mata's home without a warrant, violating the Fourth Amendment.  The trial court decided that it would first receive evidence on the Fourth Amendment issue.  After a two-day hearing, the court granted that part of Mata's motion, finding "enormous" "credibility issues" with the account of the state's witnesses.  But even though Mata's videotaped confession raised similar credibility issues, and even though it involved *more* blatant officer misconduct, Mata's lawyer simply let that motion slip through the cracks.  He agreed to a trial date without pressing for a hearing or a ruling.  Nor did he offer any explanation—either strategic or otherwise—for this monumental lapse in judgment.

Unsurprisingly, Mata's confession was devastating at trial.  Mata testified that the men he shot were brutally assaulting his friend and firing their own shots at him, entitling him to an affirmative defense under Illinois law.  Several witnesses gave similar testimony.  But much of this testimony was inconsistent with what Mata said during the coerced video interrogation, and the state capitalized on those distinctions, referring to Mata's testimony as "lies" that were "totally different" from his

confession.   As the Illinois Appellate Court later put it, the confession was "the most critical" evidence of Mata's guilt.   He was convicted and sentenced to life in prison.

After an unsuccessful direct appeal, Mata filed a *pro se* post-conviction petition in Illinois Circuit Court, arguing that his trial counsel had been ineffective for failing to move to suppress the videotaped confession, and that his appellate counsel had been ineffective for failing to raise that issue on direct appeal.   The Circuit Court dismissed Mata's petition, and the Illinois Appellate Court affirmed.   It held that Mata's claim about trial counsel was procedurally defaulted because he did not raise it on direct appeal.   And it rejected Mata's appellate-ineffectiveness claim because he had said *on the video* that he was speaking "freely and voluntarily"—that is, during the very interrogation that Mata claimed was coerced.

So Mata exited the Illinois court system without any consideration of whether his confession was *induced* by coercion.   He then turned to the Northern District of Illinois, raising his ineffective assistance claim in a Section 2254 petition.   The district court denied the petition based on the state's court's rationale.   This Court then granted a certificate of appealability, explaining that "reasonable jurists could debate whether Mata procedurally defaulted his claim that his trial attorney was ineffective for failing to demand a hearing on Mata's motion to suppress," and that Mata had made a "substantial showing" on the underlying "constitutional claim."

The Court should reach the merits of Mata's claim.   The Illinois Appellate Court's procedural ruling is not "adequate to bar federal habeas review" because it did not "rest upon firmly established and regularly followed state practice." *Franklin*

*v. Gilmore*, 188 F.3d 877, 882 (7th Cir. 1999). To the contrary, Illinois courts have held that when "a defendant's ineffective assistance of counsel claim requires consideration of matters not included in the record on appeal, a postconviction relief proceeding is better suited to resolve that claim." *People v. Phillips*. 383 Ill. App. 3d 521, 544-45 (2008). For that reason, the Illinois Supreme Court has "repeatedly noted that a default *may not* preclude an ineffective-assistance claim for what trial counsel allegedly *ought* to have done." *People v. West*, 187 Ill. 2d 418, 427 (1999) (emphases added). Mata's claim fits each of these descriptions. But the state courts faulted him for using the exact procedure they have consistently approved.

On the merits, Mata's claim is unusually straightforward. Normally, when a party argues that his lawyer was ineffective, the court has to make a challenging inquiry into whether the lawyer's decisions were grounded in a reasonable strategy. Here, there was *no* apparent strategy. Mata's lawyer actually filed a motion to suppress the videotaped statement but failed to pursue it without any justification. The state court attempted to *construct* a strategic basis for counsel's decision, but that was unreasonable under *Strickland*: "Just as a reviewing court should not second guess the strategic decisions of counsel with the benefit of hindsight, it should also not construct strategic defenses which counsel does not offer." *Harris v. Reed*, 894 F.2d 871, 878 (7th Cir. 1990). And in any event, the court's rationale was entirely circular: If found that Mata's motion to suppress the videotaped statement would have failed because of what he said *during* that (involuntary) statement.

This Court should reverse and direct the district court to grant Mata's petition.

4

# JURISDICTIONAL STATEMENT[1]

The district court had jurisdiction under 28 U.S.C. § 2254(a). On September 21, 2020, the district court denied Mata's petition and declined to issue a certificate of appealability. A1782-1802; SA38-58. On November 3, 2020, this Court received Mata's timely notice of appeal, postmarked on October 19, 2020. Dkt. 1; A1804. The Court granted Mata a certificate of appealability on March 11, 2021. A1809; SA59. This Court has jurisdiction under 28 U.S.C. § 2253(c).

# ISSUES PRESENTED FOR REVIEW

1.    Whether Mata procedurally defaulted on his claim for ineffective assistance of counsel by raising it for the first time in a state post-conviction proceeding, and whether any procedural default is excused for good cause by the failure of Mata's appellate counsel to raise the ineffective assistance claim.

2.    Whether the state court unreasonably rejected Mata's ineffective assistance claim where, without justification, Mata's trial attorney filed but failed to pursue a motion to suppress his videotaped confession.

# STATEMENT OF THE CASE

On March 15, 2002, when Mata was 20 years old, he attended a party in Chicago with his fiancée, Esmeralda Herrera, and his friends Reynaldo Mares, Chad Cruz, Karina Pinedo, Nichole Bell, and Sandy Diaz. A1053. While at the party, Mata

---

[1]    Citations to "SA__" refer to the short appendix bound with this brief. *See* Cir. Rule 30(a). "A__" is the main appendix submitted with this brief. *See* Cir. Rule 30(b). "Dkt. __" and "District Ct. Dkt. __" refer, respectively, to entries on this Court's docket and the district court's docket that are not in either appendix.

saw two men he did not know. A1049-51. In the early hours of the next morning, Mata left the party with Herrera, Mares, and at least two of his other friends from the party. Mata and Herrera were walking ahead of the others when Mata heard Mares call for help. A1055. Mata turned around and saw Mares restrained by a group of men. A1056. Mata then confronted those men and fired shots at them, killing Sander Mosqueda and Adrian Padilla, and injuring Edwin Delgado. A1056-58.

Just about everything else was sharply contested. There were conflicting accounts about the events before and after Mata fired the shots, which were relevant to whether Mata was acting under a belief that deadly force was justified to defend himself and Mares. Those accounts are described chronologically below.

### A.    Mata's Arrest And Videotaped Confession

The Chicago police arrested Mata in his home at around 5:00pm on March 16, 2002. A814. The details of the arrest were in dispute. *See* pp. 11-13 *infra*. But it is undisputed that, over the next 27 hours, Mata was interviewed at a police station by Detective Patrick Smith, Detective Kevin Bor, and ASA Lisette Mojica. A561-62, 823, 836. At 7:30pm the following day, ASA Mojica took a videotaped statement from Mata. A573. Both the video and ASA Mojica's outline notes are part of the record. *See* A4, 7. As depicted below, the interview took place in a small room with no windows. A7.

6



Throughout the interview, ASA Mojica presented Mata with specific factual assertions—framed in the affirmative or in the negative—and directed him to answer yes or no. Almost every time, Mata adopted ASA Mojica's framing. *See, e.g.*, A7 at 12:12-12:28 (Q. "Is it correct to say that you saw, or heard rather, Reynaldo calling your name?" A. "Yes, I did." Q. "Okay, and after Reynaldo called your name, did you look back to see Reynaldo being held by the hands by the two men?" A. "Yes."). Mata was not permitted to give his account of the shooting in his own words.

At the outset of the interview, ASA Mojica noted that she had spoken to Mata before the video began. *Id.* at 0:56, 1:24-1:51. She asked Mata to confirm that she had advised him of his constitutional rights before they spoke; Mata said yes. *Id.* at 0:57-1:14. Mata also provided some information about his background, including that he had a ninth-grade education, that he was living in Aurora, Illinois with Herrera, and that they had a daughter who was 13 months old. *Id.* at 3:26-4:01.

ASA Mojica then turned to the events that led up to the March 16, 2002 shooting. Mata explained that at the party in Chicago, "two guys that nobody actually knew showed up"; they stayed for about 30 minutes, smoked marijuana, and left without speaking to anyone. *Id.* at 6:20-6:47. Mata left the party about one hour later with Herrera and several of his friends, including Mares. *Id.* at 9:08-9:25. As the group was walking toward Herrera's car, Mata heard Mares call his name from behind. *Id.* at 12:12-12:19. When Mata turned around, he saw four men, including the two from the party and two others he did not know, "holding [Mares'] arms back" "by . . . his hands." *Id.* at 12:21-12:27, 12:43-13:25.

Mata was carrying a gun that he had found two months earlier in a park, which he felt he "needed" "for [his] protection." *Id.* at 8:03-8:17, 13:55-14:02. Mata "shot one shot" "toward the direction" of the four men and moved closer to Mares. *Id.* at 4:10-4:17, 16:05-16:13. One of the men "reach[ed] for his pocket," and "the first thing that came to [Mata's] mind [was] that he had a gun," but Mata answered "No" when Mojica asked whether he actually saw "any of the men [with] a weapon." *Id.* at 14:17-15:31, 19:49-20:17. Mojica asked Mata if the men "had their backs to [him]" at the time, and Mata responded in the affirmative. *Id.* at 16:40-16:44. Mata said that he fired "about five" shots in the direction of the four men. *Id.* at 15:37-15:44.

After firing those shots, Mata fled to Herrera's vehicle with Herrera, Mares, Pinedo, and Cruz, and the group drove back to Aurora. *Id.* at 17:36-17:48. Notably, ASA Mojica did not ask Mata whether he had heard shots fired other than his own,

despite noting in her outline that Mata claimed before the video that he heard "shots" as he was fleeing the scene. A4 ("post shots only hear, don't see").

At the close of the interview, Mojica asked Mata a series of questions about his confinement. She first asked if she and the police had "treated [Mata] well and fairly." A7 at 20:30-20:37. Gesturing to Detective Smith, who (as shown below) was staring directly at Mata as he answered, Mata replied: "Yes, Mr. Smith here has treated me well, and I didn't give no bad attitude towards nobody here." *Id.* at 20:37-20:45.



Mojica asked Mata what he had for breakfast and dinner that day. *Id.* at 20:57-20:59, 20:14-20:15. Mata responded that he had a "hash brown and a pop" for breakfast and "a soda pop and a nice big slice of pizza" for dinner. *Id.* at 20:59-21:20. Mojica asked whether Mata was able to use the bathroom when needed, and Mata replied that he was. *Id.* at 21:34-21:38. Mata affirmed Mojica's assertion that he made the video

"freely and voluntarily." *Id.* at 21:46-21:50. And finally, ASA Mojica asked: "No one here including myself, the detectives and the police, no one has made any threats or promises?" *Id.* at 21:50-21:55. Mata replied: "No, no they haven't." *Id.* at 21:55.

Mata was charged in the Circuit Court of Cook County with two counts of first-degree murder and one count of aggravated battery with a firearm. A1463. He retained Nathanial Jones to serve as his counsel.

### B.    Pretrial Suppression Proceedings

#### 1.    Mata's Motion To Suppress

In April 2003, Jones filed a motion to suppress "all oral, videoed and written statements made by [Mata]." A8. Among other things, he argued that Mata's videotaped "confession was not voluntary." A9. The motion explained that Mata was subjected to "physical and mental abuse by the Chicago Police Department for two days prior to being given any *Miranda* warnings"; that he "was poked and profaned by the Chicago police"; and that he "was forced to stand handcuffed to a cell wall for hours." *Id.* The motion further asserted that Mata "was threatened by Chicago Police officers" (*id.*), but it did not identify the content of the threats.

A little less than a year later, Jones filed an amended motion to suppress. A11-12. Although the factual allegations were the same, the amended motion "clarified" that the evidence collected during Mata's arrest had to be suppressed on two separate legal grounds. A11. First, the Fourth Amendment required the suppression of "evidence garnered at the time of the police warrantless entry into [Mata's] residence." *Id.* Second, the Fifth Amendment required the suppression of "any and all statements made by [Mata]" because they had been coerced. *Id.*

10

### 2.    Hearing On The State's Warrantless Entry

On April 22 and 29, 2004**,** the trial court held hearings on Mata's motion to suppress.  But the court expressly severed the two components of Mata's motion and directed counsel to address *only* the alleged warrantless entry on those two dates. The court explained that it would be unwarranted to "overlap and collapse these motions," and that therefore, "in this hearing," the parties and the court would be "talking about the defendant's Fourth Amendment issues only."  A16.

Mata and Herrera testified that while they were at home watching a movie with their one-year-old daughter, they heard police officers banging on the door.  A22, 49.  When Mata opened the door, he "was slammed against the wall and dragged out" of his home, after which five officers "swarm[ed] inside the house."  A22-24, 50, 75. The officers dragged Mata down the stairs outside his front door and pushed him against the trunk of a squad car.  A50.  Herrera repeatedly asked the officers whether they had a warrant, and the officers said they did not.  A23.  One responded, "we don't want to go there," and "[d]on't waste our time."  A24.

Mata testified that, while he was "face down" on the trunk of the police car, one of the officers "put a piece of paper in [his] face and told [him] to sign it."  A50-51. Mata signed the document without reading it.  A51-52.  The form purported to obtain Mata's consent for a search of his home.  A60.  Mata testified that the officers "definitely" did not read him his *Miranda* rights, and that he "definitely" did not agree to speak with any of them.  *Id.*  But because this hearing addressed only the warrantless entry, Mata did not discuss the interrogation leading up to his

11

videotaped confession, including the threats made by the police and the promises he received in exchange for making his statement.

The officers provided a very different account of the arrest. According to their testimony, the interactions with Mata were "calm," "cordial," and even "gentlemanly," from the first knock on the door to the signing of the consent form. A144, 167. Detective Bor testified that he did not slam Mata against a wall when arresting him, but rather handcuffed him and walked him outside. A90. Detective Bor said that he "kindly walked [Mata] to the [police] vehicle" and "placed him in the backseat" (A90, 109), after which he read Mata his *Miranda* rights from the front seat (A111) and gave Mata the consent form to sign (A97, 139, 167).

The officers testified that none of them entered Mata's home until at least five minutes after Mata signed the form consenting to the search. A95-97, 141, 167. They claimed that it was impossible for them to "swarm[]" the house before that time (as Herrera had testified), because there were only three officers present until they called for backup, and they were all outside with Mata. A163, 178-79. One detective also testified that when the officers began searching the home, Herrera was not inside and never talked with the officers. A142.

After hearing these "sharply disputed" accounts, the trial court found "enormous" "credibility issues" with the testimony of the arresting officers. A220-21. As the court explained:

> It's difficult to believe that neither [Herrera nor Mata] showed any reaction regarding the authority under which the police operated.

12

> [Herrera's] testimony that she repeatedly asked about a
> warrant is credible. The record is devoid of any
> conversation that the police had with [Herrera] except
> what she says. If her testimony is not credible, then the
> conclusion must be that she stood in her home mute while
> the police arrested [Mata].
>
> To avoid this consequence, the court is told that the police
> never entered the home, even to arrest [Mata], until after
> the consent to search had been executed. This appears to
> be terribly foolhardy.
>
> These well-trained police officers proceeded to arrest a
> person they believed to have been involved in a shooting
> which left two people dead and one injured and made no
> effort to determine who was in the house and whether they
> posed a threat to them. Nor does it appear any less
> foolhardy to leave [Herrera] in the house—to leave [her]
> alone in the house as their testimony establishes. Such
> conduct is inconsistent with police work and a sense of
> safety.

A221-22.

The court concluded that Mata had "involuntarily consented" to the search of his home. A223. It therefore granted Mata's motion with respect to the warrantless entry and suppressed the evidence seized from Mata's home at the time of his arrest, which consisted of "a jacket and some gun patches." A200, 224, 227-32.

At the end of the two-day hearing, the court emphasized that "the motion to suppress statements is still . . . viable." A212; *see also* A227-31. The court promised to "make some resolution" of that motion during a status conference scheduled for June 8, 2004. A225.

### 3.    Defense Counsel's Abandonment Of Mata's Motion

From that point forward, there were only a few brief mentions of Mata's motion to suppress his confession. At the June 8 status conference, Jones *initially* asked that

the motion be heard on July 13, 2004.    A234.   The court responded that it was unavailable that day, and would be "back in the court" on "July 20." *Id.* But rather than requesting a *hearing* on that date, Jones replied: "Could we *just have a status date* on the [20]th?" *Id.* (emphasis added).  The court agreed. *Id.*

Then, on July 20, the parties and the court set the matter for trial *without* scheduling a hearing on the motion to suppress.  The following colloquy occurred:

> THE COURT: Have we completed all of the pre-trial Motions?
>
> MR. JONES: That was one other half of my Motion to Suppress.
>
> [STATE'S ATTORNEY]: Judge, we have agreed on a trial date of September 20th, by agreement, with, for jury indicated at this time.
>
> THE COURT: By agreement, September 20th, with subpoenas for trial.  Jury is indicated.

A238.

Jones never explained here, or anywhere else in the record, why he did not ultimately pursue a hearing on the motion to suppress.  The trial court never ruled on the motion.  Jones had waived it, apparently by oversight.

### C.    Trial

Mata's jury trial began on January 11, 2005.  A255.  The state contended that Mata was guilty of first-degree murder for the deaths of Mosqueda and Padilla, and that he was guilty of aggravated battery with a firearm for the non-fatal shooting of Delgado.   Mata invoked two alternative defenses under Illinois law, which were detailed in the jury instructions.  First, "a person is justified in the use of force which

is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself and/or another." A1409. Second, when a defendant has an *unreasonable* belief that such force is necessary, this "reduce[s] the offense of first degree murder to the lesser offense of second degree murder." A1402. At trial, Mata argued that he had a reasonable—or, alternatively, an unreasonable—belief that the use of force against Mosqueda, Padilla, and Delgado was necessary to defend himself and Mares.

### 1.    The State's Case

The state built its case around Mata's video confession and several witnesses, only one of whom—Delgado—was present at the crime scene.

Delgado testified that when the two groups encountered each other on the street, he was at first able to see Padilla and Mares, but not Mosqueda. A647. Padilla asked Mares who he was, and Mares told Padilla to "[f]uck off." A644-46. Mares hit Delgado in the chest, and Delgado pinned Mares to the ground. A647. According to Delgado, no one physically struck Mares. A652. After Mares called Mata for help, Delgado "looked up and [a] gun was already drawn in [his] face." A649. Delgado told Padilla that Mata had a gun and released Mares. A650. He then "turn[ed] around" and "got shot" "in the rear end." *Id.* Delgado testified that Mata fired "six" shots in his and Padilla's "direction" as they fled, and that he saw Padilla clutching a wound in his stomach. A650, 652-53, 655, 659-60. Delgado also saw a man, who he later learned was Mosqueda, "stagger[] along" the sidewalk and fall. A659.

Detectives Patrick Smith and Kevin Bor testified that they arrested Mata at around 5:00pm on the day of the shooting and read him his *Miranda* rights. A814,

818. Smith testified that, starting around 12:30am on March 17 (7.5 hours after the arrest), he interviewed Mata at the police station with no one else present. A836-37. Smith claimed that Mata was not handcuffed and that Smith began the interview by reading Mata his *Miranda* rights a second time. A837-39. The two talked for about 20 to 30 minutes. A840. According to Smith, Mata said that after he left the party, he saw "four or five guys" who seemed like they were "going to bother" Mares; that he heard gunshots; and that he and his friends ran to Herrera's vehicle and drove home. A844. Smith testified that Mata never said Mares was attacked. A846.

Smith spoke to Mata again at around 2:20am the same morning, this time with Detective Bor. A846-47. Smith told Mata that he had been picked out of a lineup. *Id.* During this interview, Mata allegedly told the detectives that after he left the party, "he looked back and saw [Mares] with a gun and then the gun just kind of went off." A848. According to Smith, Mata did not say that anyone struck Mares, or that anyone other than Mares had a weapon. A849.

Smith testified that, during the course of both interviews, he did not make Mata any promises and that Mata freely and voluntarily agreed to speak with him. A849. On cross-examination, Smith denied that he told Mata he would be allowed to speak to Herrera if he gave a videotaped statement. A850-51. Jones attempted to elicit testimony about discussions that occurred immediately after Mata's videotaped statement, but the court sustained the state's objection that these questions were beyond the scope of direct. A851-52. The specifics of the discussions are therefore not in the trial record.

16

The state also called ASA Mojica.  She conducted two initial interviews of Mata from 6:40am to 7:00am and 4:30pm to 5:00pm (also on March 17), with Smith present.  A561-62, 564, 566.  Mojica, like Smith, claimed that she gave Mata *Miranda* warnings and that he agreed to speak with her.  A563-64.  Mata gave an account similar to his earlier interviews.  A561.  According to Mojica, Mata agreed to give a videotaped statement and signed a consent form.  A569-70.  The statement was taken at around 7:30pm on March 17, 27 hours after Mata's arrest.  573.  The prosecution played the video—summarized above (*see* pp. 7-10 *supra*)—in full for the jury.  A574.

During her cross-examination, Mojica acknowledged that she did not question Mata on video about the gunfire Mata heard at the scene.  A598, 601.  She omitted these facts despite having written the outline to ensure that she "wouldn't forget to have [Mata] talk about *everything* that he had told [her] about the incident."  A591, 597-98 (emphasis added).  Jones then attempted to introduce the outline itself, but the state objected based on hearsay.  A592-93.  Jones explained that the notes were critical to Mojica's "credibility" because they reveal "16 different items that she meant to cover" but omitted.  A593.  The court sustained the state's objection.  *Id*.  The court then precluded Jones from addressing conversations between Mojica and Smith about promises made to Mata in return for his agreement to give the videotaped statement.  A578-81.  The specifics of these promises are not in the trial record.

### 2.    **Mata's Defense**

During the defense case, Jones called six of the people who left the party together on the night of the shooting: Mata, Herrera, Mares, Pinedo, Bell, and Diaz.

The accounts of these eyewitnesses were inconsistent with both Delgado's testimony and Mata's videotaped statement.

Mata testified that after he and the group left the party, he heard Mares yell for help. A1055-56. When Mata turned around, he saw "three to four [men] beating on [his] friend," "kicking him," and "punching him" on the sidewalk. *Id.* Mata told Herrera to run and he went back to help Mares. A1056-57. He recalled feeling "scared" because it was the "middle of the night," he did not "know the neighborhood," and "a bunch of guys [were] jumping on [his] friend." A1057-58.

Mata's "first reaction" was to "shoot one time in the air" as a "warning shot." A1056. Contrary to his videotaped statement, Mata testified that after he fired this shot, the men backed away from Mares but then "just stood there" and "kept looking at [Mata]." *Id.* "As [Mata] . . . reach[ed] for [his] friend," he saw one of the men reach toward his waistband. A1057-58. Mata fired his gun at the men. *Id.* When asked why he fired this second shot, Mata answered: "Because I was afraid for [Mares's] life, and because they weren't going away, they stayed there. They just kept looking at us. As soon as I reached down, that's when one started reaching for his gun." A1060-61. Mata clarified that he did not *see* a gun in the man's waistband, so he did not "*know* if it was a gun," but he did see the man "reaching" for something, which was naturally "scary" in light of the violent setting. A1061 (emphasis added).

Mata and Mares fled for Herrera's car, at which point Mata heard gunshots coming from behind him. A1058. Mata then saw one of the unknown men actually discharging a firearm. A1059. He testified that, "[a]s I jumped in the front passenger

18

seat I looked to my left and I see this guy running down the street shooting, and I know he was shooting because I just seen little flashes coming from his hand." *Id.* Mata explained that he did not relay these facts during his videotaped statement because "[he] was too scared." A1113.

On cross-examination, the prosecution leaned heavily on inconsistencies between Mata's testimony and his videotaped statement. Among other things, the prosecution highlighted that Mata had said on video (but not at trial) that Mares was being held by the arms "by either one or two guys" (A1097); he did not say on video that Mares was struck in the head or body (A1097-98); he said on video that he fired his shots as the men were fleeing, not that they stood their ground (A1107); and he never said on video that he saw someone "with a gun firing at [him]" (A1120).

The defense's other eyewitnesses provided accounts similar to Mata's direct testimony. Herrera testified that Mares was "attacked" by "about three or four guys," who "punch[ed]," "kick[ed]," and "beat[] him." A1005. Then, as she and Mata fled the scene, a man ran toward her and Mata firing a gun. A1003. On cross-examination, Herrera testified that she told the police about the other shooter but that the police did not include this fact in her written statement. A1024, 1028. Herrera also explained that, in exchange for making her written statement, an officer "promised" her "that he would not take [her] daughter" away. A1039.

Mares testified that he was holding Pinedo's hand when the group left the party, and that as they were walking outside, Pinedo was "snatched out of [his] hands [and] thrown to the ground," at which point three men began "beat[ing him] down."

19

A1134.  Mares explained:  "I'm getting kicked, I'm getting punched, I'm scared, I'm in fear of my life.  I thought I was going to die that night."  *Id.*  He then curled up in a ball on the ground and yelled for Mata's help.  A1135.  Pinedo similarly testified that, as she was leaving the party, she was pushed to the ground, "saw [Mares] on the floor," and "felt scared," as though "we were being chased."  A928-30.  Mares, Pinedo, Diaz, and Bell all testified that the group of men fired shots at them as they fled the scene.  *See* A1137 (Mares was "still hearing shots fired" and saw "some guy running down the street just shooting" as he tried to get into the car); A928-29 (Pinedo "kept hearing shooting all the way to the car"); A952 (Diaz: "There was a van and shooting was coming out of the van"); A971-72  (Bell: the men "continued to shoot at [her and Diaz]" as she and Diaz ran to her car).

### 3.    Closing Arguments

During his opening statement, Jones had told the jury that it "would hear testimony of what was promised to get [Mata's] video [statement]," and that "there were some negotiations done prior to the video being made."  A548.  But having failed to elicit any material testimony on this subject, Jones could not address it in his closing argument.  Nor did he argue that Mata's statement was given involuntarily.  Instead, Jones focused on briefly recapping the testimony of each witness (A1279, 1282-85), noting inconsistencies in Delgado's testimony (A1280-81), and responding to a limited set of allegations by the state, including that Pinedo was intoxicated (A1282-83) and that Bell and Diaz did not leave the party with the group (A1292).

The prosecution, by contrast, relentlessly hammered the defense with Mata's videotaped statement, calling his trial testimony "lies."  A1317.  The state told the

jury: "What does Roberto Mata get up and tell you, something totally different than [what] he said on the videotape[d] statement back on March 17th, when he was telling the police and [ASA] Mojica what happened." A1299. The state pointed out that Mata "never said" on the video that "[t]here was a man running after [Mata] firing shots." A1305. It suggested that Mata knew at the time of the video that none of the other witnesses would "tell the police they ever saw [Mares] get beaten up." A1306. And it even accused Mata of deliberately crying on the stand, arguing that because Mata did not cry during his videotaped statement, his tears at trial were "crocodile tears" manufactured for the jury's "benefit." A1310. The state urged the jury: "Don't give him the benefit of allowing lies to cause you to lower this crime from what it is, a first degree murder. Remember his statement from the videotape." A1318.

### 4.     Verdict, Post-Trial Motions, And Sentence

The jury found Mata guilty of two counts of first-degree murder and one count of aggravated battery with a firearm. A1379, 1411-13. Mata moved for a new trial, arguing that evidence outside the trial record demonstrated that his video statements were involuntary. Among other things, Mata explained that if the court had permitted his lawyer to ask the states' witnesses about "the circumstances surrounding the creation of the video," "[t]he questioning would have shown the promises made to Robert Mata in order to get [him] to agree to make the video." A1415. The court denied Mata's motion. A1436. It sentenced Mata to two natural-life terms (one of which was vacated on appeal) and one ten-year term (which was ultimately made concurrent with his life sentence). A1463, 1499-1514; SA1-16.

21

### D.     Direct Appeal

Mata appealed to the Illinois Appellate Court.  Represented by new appellate counsel, Mata raised only one challenge to his conviction: that his trial counsel was ineffective for failing to adequately impeach Edwin Delgado.  Although Jones did impeach many of Delgado's statements, Mata argued that he should have addressed Delgado's testimony about his whereabouts prior to the shooting and his "common gang affiliation with [Padilla]."  A1489-90.  The Appellate Court rejected this argument, holding that Mata was not "prejudiced by the alleged errors" because "[t]he most salient evidence the State presented against defendant, and the most critical to proving his guilt beyond a reasonable doubt, was the video statement provided by defendant."  A1508; SA10.

### E.     Post-Conviction Petition In Circuit Court

Now proceeding *pro se*, Mata brought a post-conviction petition in Illinois Circuit Court under 725 ILCS 5/122-1.  Mata argued that his trial counsel was ineffective because he failed to pursue the motion to suppress his videotaped statement, and that his appellate counsel was ineffective because he failed to raise the suppression issue on direct appeal.  A1515-32.  Mata pointed to the favorable ruling on his Fourth Amendment claim and explained that if the trial court had made "a ruling on the second part of" his motion suppress, it "may have granted that part of the motion as well."  A1519.  Mata argued that he was prejudiced by the admission of the videotaped statement, particularly in light of the Appellate Court's description of that statement as the "most critical" and "most salient evidence" in his case.

A1518.  Mata also noted that he asked his appellate counsel to raise the issue on direct appeal.  A1519.

The trial court dismissed Mata's petition as "frivolous and patently without merit."  A1542; SA26.  First, the court held that Mata's motion to suppress "would likely have been rejected" because he "never claimed that [the videotaped statement] was involuntary or the result of coercion" (A1541; SA25)—a puzzling assertion in light of the contents of the motion that Jones actually filed (*see* p. 10 *supra*).  Second, the court concluded that "[c]ounsel's decision concerning which issues to focus on during [the suppression] hearing is a matter of trial strategy" (A1541-42; SA25-26)— without identifying a strategy *articulated* by counsel that would justify his failure to pursue a *separate* hearing on the motion to suppress the video (*see* p. 14 *supra*).  Notably, the Circuit Court did not hold that Mata's ineffective assistance claims were procedurally barred; it addressed the claims solely on their merits.

## F.    Post-Conviction Appeal

Mata was granted leave to appeal, and the Appellate Court affirmed.  Unlike the Circuit Court, it first held that Mata had waived his trial-ineffectiveness claim by failing to raise it on direct appeal:

> Although trial counsel filed the motion to suppress statements as involuntary, he apparently abandoned the motion.   The State played defendant's videotaped confession at trial and provided testimony regarding his earlier statements to police and the ASA.  The motion to suppress and defendant's videotaped confession therefore were matters in the trial record, such that defendant could have raised the present claim on direct appeal.

A1625-26; SA32-33 (citations omitted).

The court then addressed Mata's claim that his appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness on appeal. The court found that this depended on whether trial counsel actually *was* ineffective, which in turn depended on whether "the motion [to suppress] would have been granted." A1626-27; SA33-34. The court rejected Mata's argument on the ground that his account was "contradicted" by the state's witnesses (who the trial court had found incredible) and his videotaped statement (the very thing he wanted to suppress):

> Defendant contends his motion to suppress correctly states that he was not given *Miranda* warnings and his statement was involuntary based on physical and mental abuse by the police.
>
> Defendant's contentions, however, are contradicted by the trial record. Detective Bor, Detective Smith, and ASA Mojica all testified that at separate times following defendant's arrest, they advised him of his *Miranda* rights and, in each instance, he stated he understood them. In the videotaped statement played at trial, ASA Mojica again advised defendant of his *Miranda* rights, and he stated he understood each one as she read them. Defendant acknowledged ASA Mojica was not his attorney, but stated that he wished to make the videotaped statement anyway. Defendant further stated that the police detectives and ASA had treated him well, providing him with sustenance, and that he was making the statement freely and voluntarily absent threat or promise in exchange. Defendant, in fact, elected to praise Detective Smith for treating him fairly while in custody. Because the record flatly contradicts defendant's claims of abuse, and defendant has not pointed to any evidence outside the trial record or affidavits in support of his claims, there is no reason to believe defendant's motion to suppress would have been granted.
>
> Given this record, we can also presume defense counsel intended to abandon the motion as part of sound trial strategy. This is especially true where counsel successfully argued a motion to suppress evidence seized at the time of

> defendant's arrest and zealously represented defendant at trial by presenting the testimony of a number of witnesses involved in the incident on the evening in question.
>
> Because we may presume trial counsel abandoned the motion as part of sound trial strategy and, most importantly, because defendant's motion had no likelihood of success, appellate counsel cannot be faulted for failing to argue on direct appeal that trial counsel was ineffective for not litigating the motion to suppress.

A1627-28; SA34-35.

Mata petitioned for leave to appeal to the Supreme Court of Illinois. The court summarily denied his petition. A1629; SA36.[2]

## G.   Habeas Petition

On February 27, 2012, Mata filed a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254 in the Northern District of Illinois. A1630-1721. He raised both his trial- and appellate-ineffectiveness claims. A1638, 1640. Mata reiterated the physical and mental abuse he had suffered at the hands of the arresting officers, as described in his motion to suppress and at his pretrial hearing on the warrantless entry. A1643-47. Mata further alleged that he "would have testified" to additional facts outside the trial record had his lawyer pursued an evidentiary hearing on the motion, including that he "was promised if he made the video confession his fiancée would not be jailed for 5 years," and "that his daughter would not be taken by [the Department of Children and Family Services]." A1643.

---

[2]   Mata filed a successive post-conviction petition on an issue unrelated to this appeal, which was denied. Dist. Ct. Dkt. 20-3.

The district court denied the petition on September 21, 2020. A1784-94; SA38-58. As relevant here, the court first adopted the Illinois Appellate Court's decision that Mata's trial-ineffectiveness claim "was procedurally barred because the motion to suppress and [Mata's] videotaped confession were matters in the trial record, such that Mata could have raised the . . . claim on direct appeal." A1794; SA48 (alterations omitted). The court "note[d] Mata's contention . . . that several factors relating to the voluntariness of the statement were not in the trial court record, suggesting that he could not have raised his ineffective assistance claim until his post-conviction petition." A1794 n.4; SA48 n.4. But the court declined to address this argument on the merits, reasoning that "the state courts determined that this claim could have been raised on direct appeal," and "[i]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Id.*

Like the Illinois Appellate Court, the district court then evaluated trial counsel's effectiveness in the course of ruling on Mata's claim relating to his appellate counsel. A17997-1802; SA51-56. The court found that there was an "abundance of evidence demonstrating that Mata voluntarily gave his video statement," including "testimony from two police detectives and an [ASA] to the effect that Mata understood his *Miranda* rights, waived them, and wanted to make the statement, and the video statement itself, wherein Mata stated he understood and waived each *Miranda* warning and that he was voluntarily giving the statement free of threats and promises." A1802; SA56. Based on this evidence, the court could not "conclude that the state appellate court's determinations—that a motion to suppress the statement

would not have succeeded, that trial counsel presumably abandoned the motion, and that appellate counsel was not ineffective for failing to argue ineffective assistance of trial counsel with respect to the motion—were unreasonable." A1802; SA56. The district court declined to issue a certificate of appealability. A1782; SA38.

## H.    Certificate Of Appealability

On March 11, 2021, this Court granted Mata a certificate of appealability:

> After reviewing the district court's final order and the record on appeal, we find that reasonable jurists could debate whether Mata procedurally defaulted his claim that his trial attorney was ineffective for failing to demand a hearing on Mata's motion to suppress his videotaped confession. Specifically, the parties should address the state court's holding that Mata needed to raise his claim on direct appeal, rather than saving it for post-conviction review. To the extent that Mata's claim relies on facts not developed in the trial record, there is room to debate whether applying Illinois's direct-appeal rule here amounted to an adequate and independent state-law ground of decision. As for the underlying constitutional claim, Mata has made a substantial showing of the denial of his right to effective assistance of counsel under the Sixth Amendment.

A1809; SA60. The Court later appointed the undersigned to serve as Mata's pro bono counsel. Dkt. 13.

## STANDARD OF REVIEW

This Court reviews *de novo* the district court's denial of habeas relief. *Peterson v. Douma*, 751 F.3d 524, 529 (7th Cir. 2014). That includes both "the district court's procedural default ruling," *Hadley v. Holmes*, 341 F.3d 661, 664 (7th Cir. 2003), and its ruling on the merits, *Peterson*, 751 F.3d at 529. The latter is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The decision on review is the Illinois Appellate Court's opinion on Mata's post-conviction petition—"the last state court decision to address the merits of [Mata's ineffective assistance] claim." *Weaver v. Nicholson*, 892 F.3d 878, 883 (7th Cir. 2018). "A state court unreasonably applies clearly established Supreme Court precedent 'if the state court identifies the correct governing legal principle' but 'unreasonably applies that principle to the facts of the [ ] case.'" *Rhodes v. Dittmann*, 903 F.3d 646, 655 (7th Cir. 2018) (quoting *Wiggins v. Smith*, 539 U.S. 510, 520 (2003)). "This standard is quite deferential, though federal courts do not and should not merely rubber-stamp approval of state-court decisions that stray too far from federal constitutional requirements." *Id.* When faced with such a decision, this Court "can and do[es] grant relief." *Dassey v. Dittmann*, 877 F.3d 297, 302 (7th Cir. 2017).

## SUMMARY OF ARGUMENT

The Court should reverse the decision below and direct the district court to grant Mata habeas relief. Mata's ineffective assistance claim is not procedurally

barred because the state court did not provide an adequate state-law ground for its procedural ruling; to the contrary, the state court violated its own precedents holding that a claim like Mata's is properly brought for the first time in a post-conviction proceeding. And any procedural default was excused for good cause; if Mata's claim had to be brought on direct appeal, then his appellate counsel was ineffective.

The state court's decision on the merits was an unreasonable application of clearly established Supreme Court precedent. Mata's trial counsel offered no strategic reason for failing to pursue his motion to suppress the videotaped confession; all indications are that counsel abandoned the motion based on a simple— but disastrous—oversight. The motion—which detailed 27 hours of physical and psychological coercion by the arresting officers and the state's attorney—was highly likely to succeed, particularly because the trial court had already found "enormous" "credibility issues" with the account of the arrest offered by the state's witnesses. Mata was more than prejudiced; as the Illinois Appellate Court found on direct appeal, his confession was "the most critical" evidence of his guilt at trial.

## ARGUMENT

## I.  Mata's Ineffective Assistance Claim Should Be Decided On The Merits.

For two independent reasons, the Court should reach the merits of Mata's claim for ineffective assistance of trial counsel: (a) the state court did not provide an adequate state-law ground for its procedural ruling; and (b) any procedural default is excused for good cause by the ineffective assistance of Mata's counsel on direct appeal.

### A. Mata's Claim Is Not Procedurally Barred Because The State Court Did Not Provide An Adequate Ground For Its Decision.

A federal habeas claim is procedurally barred when the "state courts decline[] to address [the claim] because the petitioner did not meet state procedural requirements." *Thomas v. Williams*, 822 F.3d 378, 384 (7th Cir. 2016). But the state law ground must be both "independent and adequate." *Id.* "State court decisions are not adequate to bar federal habeas review unless they rest upon firmly established and regularly followed state practice." *Franklin v. Gilmore*, 188 F.3d 877, 882 (7th Cir. 1999) (citing *James v. Kentucky*, 466 U.S. 341, 348-51 (1984)); *see also Miranda v. Leibach*, 94 F.3d 984, 992 (7th Cir. 2005) (state-law ground is adequate "only if the state court applies the rule in a consistent and principled way").

The Illinois Appellate Court's procedural ruling was flatly *contrary* to the state's "firmly established" practices. *Id.* "As a general rule, where a defendant's ineffective assistance of counsel claim requires consideration of matters not included in the record on appeal, a postconviction relief proceeding is better suited to resolve that claim." *People v. Phillips*. 383 Ill. App. 3d 521, 544-45 (2008); *see also People v. Parker*, 344 Ill. App. 3d 728, 737 (2003) (same). Indeed, the Illinois Appellate Court has often "*decline[d] to adjudicate*" ineffective assistance claims on direct appeal. *People v. Ligon*, 365 Ill. App. 3d 109, 122 (2006) (emphasis added). That makes sense: On direct appeal, the court is limited to the trial record and cannot develop, much less consider, extrinsic evidence necessary to evaluate trial counsel's performance. *See, e.g.*, *United States v. Gilliam*, 255 F.3d 428, 437 (7th Cir. 2001) (limitation to the

trial record "almost invariably dooms" ineffective assistance claims brought on direct appeal). On collateral review, the reviewing court has both of those capabilities.

For these reasons, the Illinois Supreme Court has distinguished ineffective assistance claims based on "what counsel *did* do" from claims based on "what counsel did *not* do." *People v. Kokoraleis*, 159 Ill. 2d 325, 328-29 (1994) (emphases added). The former claim is often sufficiently developed at trial, in which case the failure to raise it an direct appeal can amount to a procedural default. *See id.* at 329. By contrast, the Illinois Supreme Court has "repeatedly noted that a default *may not* preclude an ineffective-assistance claim for what trial counsel allegedly *ought* to have done in presenting a defense." *People v. West*, 187 Ill. 2d 418, 427 (1999) (emphases added). That is because a "claim based on what ought to have been done may depend on proof of matters which could not have been included in the record precisely because of the allegedly deficient representation." *People v. Erickson*, 161 Ill. 2d 82, 88 (1994).

At times, Illinois courts have applied a limited exception to this rule when a claimed attorney omission is grounded *solely* in the trial record, and when the defendant does not *contend* that information outside the record is necessary to resolve the claim. *See, e.g.*, *Phillips*, 383 Ill. App. 3d at 544-45 (addressing counsel's failure to request a jury instruction on a lesser included offense, but declining to address counsel's failure to introduce an expert report that was not in evidence). Otherwise, the only proper vehicle for this type of claim is a collateral proceeding, "where the defendant has a full opportunity to prove facts establishing ineffectiveness of counsel,

[and] the government has a full opportunity to present evidence to the contrary." *People v. Bew*, 228 Ill. 2d 122, 134 (2008) (failure to file motion to suppress).

Mata's claim falls squarely within the general rule. It is about what Jones "ought to have done": pursue Mata's motion to suppress the videotaped statement. *West*, 187 Ill. 2d at 427. Throughout Mata's proceedings, he pointed to evidence of coercion that was not developed "precisely because" Jones did not seek a hearing on the motion to suppress. *Erickson*, 161 Ill. 2d at 82; *see* pp. 13-14 *supra*. If there had been such a hearing, Mata could have testified about the officers' conduct during the interrogation, including the threats and promises related to Mata's fiancée and child. *See* pp. 21, 25 *supra*. These facts were not detailed in the written motion to suppress. *See* p. 10 *supra*. And they were not developed at the hearing on the warrantless entry—because, per the court's ruling, that hearing addressed only the search of Mata's home, not his video statement. *See* pp. 11-13 *supra*.

Nor were these facts developed at trial. Jones attempted to elicit testimony from Detective Smith and ASA Mojica about the promises made to Mata in exchange for his video statement, and the court sustained the state's objections to those questions. *See* pp. 16-17 *supra*. So at that point, Jones seemed to understand that these facts were critical. But by then, it was far too late, and Jones had no choice but to abandon the coercion theory when he delivered his summation. *See* p. 20 *supra*.

Mata's last chance, then, was to develop his evidence at an evidentiary hearing during his post-conviction proceedings. There, the Circuit Court could have heard both (1) testimony from Mata and the state's witness about the events before and

after the videotaped statement; and (2) testimony from Jones about any reasons he had for failing to pursue the motion to suppress.  Instead, the Circuit Court summarily dismissed his case without a hearing—a ruling that is particularly inappropriate when a petitioner is *pro se*.  *Cf. People v. Hodges*, 234 Ill. 2d 1, 10, (2009) (explaining that "a pro se petition is not expected to set forth a complete and detailed factual recitation" and cannot be dismissed so long as it "set[s] forth some facts which can be corroborated and are objective in nature or contain some explanation as to why those facts are absent").  And the Appellate Court then deemed his ineffective assistance claim procedurally barred (*see* p. 23 *supra*), thereby faulting Mata for declining to raise his claim in the proceeding *least* appropriate for its resolution.

The district court briefly recognized this problem, noting "Mata's contention in his § 2254 petition that several factors relating to the voluntariness the statement were not in the trial court record, suggesting that he could not have raised his ineffective assistance claim until his post-conviction petition."  A1793 n.4; SA48 n.4. But the court found that "the state courts determined that [Mata's] claim could have been raised on direct appeal and was thus waived under state law," and that "it is not the province of a federal habeas court to reexamine state-court determinations of state-law questions."  *Id.* (quoting *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)).

This was error.  When faced with an asserted state-law procedural bar, it *is* "the province of a federal habeas court"—and more importantly, its obligation—to determine whether the bar is "firmly" grounded in state law.  *Franklin*, 188 F.3d at 882.  *Estelle* is not to the contrary.  There, the Supreme Court applied the well-settled

rule that "federal habeas corpus *relief* does not lie for errors of state law," because such *relief* can be granted based only on a violation "of the Constitution, laws, or treaties of the United States."  502 U.S. at 67-68 (emphasis added) (citing 28 U.S.C. § 2241).  The "adequate ground" doctrine is not directed at the ultimate question of relief; it simply prevents state courts from circumventing federal questions by enacting *procedural* barriers untethered to their own statutes or cases.  The district court could not just take the state court's word that Mata's claim was "waived under state law" (A1793 n.4; SA48 n.4); it had to evaluate whether the state court's determination of waiver was "consistent" with state law.  *Leibach*, 94 F.3d at 992.

It was not.  Because Mata's ineffective assistance claim was based on something Jones "ought to have done" (*West*, 187 Ill. 2d at 427), and because he based the claim in significant part on evidence that was not developed in the trial record (*Phillips*, 383 Ill. App. 3d at 544-45), the state court's decision was inadequate.

## B.     Any Procedural Default Is Excused For Good Cause By Appellate Counsel's Ineffectiveness.

Even if Mata procedurally defaulted on his ineffective assistance claim, any default is excused for good cause by the ineffectiveness of Mata's appellate counsel.

The Supreme Court has held that a federal habeas petitioner may "obtain review of [a] defaulted constitutional claim" by "show[ing] cause for the procedural default and prejudice attributable thereto."  *Murray v. Carrier*, 477 U.S. 478, 485 (1986).  "Attorney error that constitutes ineffective assistance of counsel is cause to set aside a procedural default."  *Franklin*, 188 F.3d at 883.  When a petitioner's right to counsel is violated, "the Sixth Amendment itself requires that responsibility for

the default be imputed to the State." *Murray*, 477 U.S. at 488; *see also Coleman v. Thompson*, 501 U.S. 722, 754 (1991) ("Where a petitioner defaults a claim as a result of the denial of the right to effective assistance of counsel, the State, which is responsible for the denial as a constitutional matter, must bear the cost of any resulting default and the harm to state interests that federal habeas review entails.").

"Whether an attorney's ineffectiveness is sufficient to overcome a procedural default is evaluated under the familiar constitutional test outlined in *Strickland v. Washington*." *Lee v. Davis*, 328 F.3d 896, 900 (7th Cir. 2003). *Strickland* requires two showings: (1) that counsel's performance "fell below an objective standard of reasonableness"; and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). In this context, the first prong "requires the court to compare the issue not raised [on appeal] in relation to the issues that were raised; if the issue that was not raised is both obvious and clearly stronger than the issues raised, the appellate counsel's failure to raise the neglected issue is objectively deficient." *Lee*, 328 F.3d at 900-01 (quotation marks omitted). "Prejudice is established if the issue not raised may have resulted in a reversal of the conviction or an order for a new trial." *Id.* (quotation marks omitted).

As the state courts and district court recognized, the outcome of this analysis depends primarily on the strength of the underlying trial-ineffectiveness claim, which is addressed in Part II below. For present purposes, there are two points worth noting. First, Mata's only challenge to his conviction on direct appeal—that Jones

had failed to adequately impeach Edwin Delgado—was weak. Neither of the topics on which Delgado made inconsistent statements—his whereabouts *prior* to the shooting and his gang affiliation—directly called into question his account of the shooting itself. A1489. As the Illinois Appellate Court put it, the unimpeached inconsistencies, "while not completely trivial, [were] nonetheless inconsequential to the issue on which the jury was asked to render its verdict." A1509.

Second, and relatedly, the Appellate Court rejected Mata's claim precisely *because* of the videotaped statement. It held that Mata was not "prejudiced" by the alleged errors because "[t]he most salient evidence the State presented against defendant, and the most critical to proving his guilt beyond a reasonable doubt, was the video statement provided by defendant." A1508; SA10. It therefore stands to reason that if Jones was ineffective for failing to move to suppress the videotaped statement—as discussed next—Mata's appellate counsel was ineffective for waiving that claim.

## II. The State Court's Decision On Mata's Ineffective Assistance Claim Was Based On An Unreasonable Application Of Clearly Established Supreme Court Precedent.

In rejecting Mata's appellate-ineffectiveness claim, the state court held that his Sixth Amendment rights were not violated at trial. The court "presume[d]" that "trial counsel abandoned the motion [to suppress the videotaped statement] as part of a sound trial strategy" because the "motion had no likelihood of success." A1628; SA35. This decision was an unreasonable application of *Strickland*. Defense counsel's performance was deficient, both because his abandonment of the motion

was not based on any relevant strategy and because the motion was likely to succeed. Mata was prejudiced; the confession became the centerpiece of the prosecution's case.

> **A.  Defense Counsel's Performance Was Deficient Because He Did Not Pursue Mata's Motion To Suppress The Video Confession.**
>
> > **1.  Counsel's Abandonment Of The Suppression Motion Was Not Grounded In Any Relevant Strategy.**

Ordinarily, *Strickland* requires "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  466 U.S. at 689 (quotation marks omitted).  But this presumption has two related limitations.  First, "the presumption applies only if the lawyer *actually exercised* judgment."  *Mosley v. Atchison*, 689 F.3d 838, 848 (7th Cir. 2012) (emphasis added).  "The consequences of *inattention* rather than reasoned strategic decisions are not entitled to the presumption of reasonableness."  *Id.* (emphasis added).  Second, when counsel fails to "*articulate* a strategic reason" for a decision, he is in "violation of his obligations as an attorney."  *Williams v. Washington*, 59 F.3d 673, 680 (7th Cir. 1995) (emphasis added).  "Just as a reviewing court should not second guess the strategic decisions of counsel with the benefit of hindsight, it should also not construct strategic defenses which counsel does not offer."  *Harris v. Reed*, 894 F.2d 871, 878-79 (7th Cir. 1990) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986), which held that an attorney was ineffective where his failure to "file a timely suppression motion" was "not due to strategic considerations"); *Bell v. Miller*, 500 F.3d 149, 157 (7th Cir. 2007) (where "the record reveals no tactical justification for the course trial counsel chose," "[c]ounsel's performance cannot fairly be attributed to a 'strategic decision'" (quoting *Rompilla v. Beard*, 545 U.S. 374, 383 (2005))).  Both limitations are applicable here.

37

**a.    Counsel Let The Motion Slip Through The Cracks.**

Based on the procedural history of Mata's motion to suppress, there is only one reasonable inference to be drawn:  Jones' failure to pursue the motion was the "consequence[] of inattention rather than [a] reasoned strategic decision[]." *Mosley*, 689 F.3d at 848.  Jones actually *moved* to suppress Mata's videotaped statement, *prevailed* on a Fourth Amendment argument that involved closely related credibility issues, but then abandoned any attempt to get a hearing on the motion.  *See* pp. 10-14 *supra*.  The trial court noted on the record that the motion was "viable" (A212), and proposed a date on which it would be available for a "resolution" of the motion (A225).  When that date arrived, Jones declined any resolution—he wanted to "just have a status conference" on a later date.  A234.  And when *that* date arrived, Jones inexplicably agreed on a *trial* date without any hearing scheduled.  *See* p. 14 *supra*.

The Illinois Appellate Court has addressed a strikingly analogous situation.  In *People v. Smith*, 326 Ill. App. 3d 831 (2001), a juvenile defendant accused of murder "was interrogated for approximately 10 minutes before the arrival of his mother, during which time [an officer] told [him] that he would not be charged if he cooperated with the police and admitted to his involvement in the murder."  *Id.* at 841.  The defendant incriminated himself, and his lawyer moved to suppress his statements as involuntary.  *Id.*  The lawyer "did not pursue the motion," and the defendant was convicted.  *Id.* at 843.  But the Circuit Court dismissed the defendant's post-conviction petition based on ineffective assistance of counsel.  *Id.* at 839.

The Appellate Court reversed.  *Id.* at 856.  It found that "[a]though trial counsel did not pursue the motion, the act of filing indicates that at one point in time, trial

counsel believed there was justification for such a motion." *Id.* at 844. "[A]fter filing a motion to suppress statements, an attorney rendering effective assistance would have continued the effort to suppress [the] statements on the basis that the confession was not voluntary." *Id.* The court rejected the state's argument that counsel's decision was justified by "trial strategy" because the "defendant's testimony at a hearing on [the] motion would [have been] inconsistent with that which was in the police report." *Id.* If that rationale were "accepted as sound strategy, there would be no basis to litigate any criminal motion," because "[i]t is to be expected that the State and the defense would offer conflicting evidence on voluntariness." *Id.* at 844-45.

This reasoning applies with even greater force here. Jones did not just *file* the suppression motion; he pursued until shortly before trial, but then failed to get a ruling. He must have believed that the motion had merit, particularly after the trial court found that the state's witnesses lacked credibility. His abandonment of the motion appears to have been a pure mistake, albeit one with massive consequences.

### b.  Counsel Did Not Articulate A Strategy.

Even if Jones dropped the motion based on a strategy, he "violat[ed] his obligations as an attorney" by failing to "articulate" that strategy. *Williams*, 59 F.3d at 680. And of course, he was never *compelled* to explain his decision because the state courts denied Mata an evidentiary hearing on his ineffective assistance claim. The Illinois Appellate Court nevertheless held that because it believed that Mata's motion to suppress was meritless, it could "*presume* trial counsel intended to abandon the motion as part of sound trial strategy." A1628; SA35 (emphasis added). Whether or not Appellate Court's premise is correct (*see* Part II.A.2 *infra*), its "presumption"

was unreasonable under *Strickland*, which requires courts to "eliminate the distorting effects of hindsight" and evaluate an ineffective assistance claim based on defense counsel's own "perspective at the time." 466 U.S. at 689.

This Court's decision in *Harris* is particularly instructive. There, the defendant argued that his attorney was ineffective for failing to call alibi witnesses. 894 F.2d at 877-78. "The district court explicitly expressed its puzzlement over [the] decision not to put these witnesses on," but it "construct[ed] a trial strategy supporting counsel's decision": that the testimony "may not have been viable as a defense." *Id.* at 878. This Court found that decision "clearly erroneous" because counsel "did not offer the strategic justifications provided by the district court," and it was improper to attribute "strategic defenses" to counsel "with the benefit of hindsight." *Id.*; *see also Davis v. Lambert*, 388 F.3d 1052, 1064 (7th Cir. 2004) (same).

Notably, the *Harris* lawyer articulated *some* strategy for failing to call the alibi witnesses: "he felt that the prosecution's case was weak" and wanted to present it as such. 894 F.2d at 878. And decisions about whether to *call witnesses* are always fraught with risk; an effective cross-examination can make any testimony backfire. By contrast, Jones never gave any justification for failing to pursue Mata's motion. And the motion had no downside; at worst, it would have been denied, in which case Mata would have been in the same situation he faced at trial. Jones' decision was not grounded in any cognizable strategy, which is deficient performance on its own.

40

## 2.    The Suppression Motion Was Likely To Succeed.

Setting aside the actual reasons for counsel's failure to pursue the motion, his decision was objectively unreasonable.  The motion would likely have been granted because Mata's confession was obtained involuntarily, in violation of due process.

"A foundational principle of due process of law is that the state cannot procure a criminal conviction through the use of an involuntary confession."  *Carrion v. Butler*, 835 F.3d 764, 775 (7th Cir. 2016) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 223-26 (1973)).  A confession is involuntary when the interrogators "overbear the confessor's free will."  *Johnson v. Pollard*, 559 F.3d 746 (7th Cir. 2009).  To determine voluntariness, a court must "evaluate the totality of the circumstances surrounding" the confession.  *Carter v. Thompson*, 690 F.3d 837, 843 (7th Cir. 2012) (quotation marks omitted).  This includes both the "characteristics of the accused" and the "details of the interrogation."  *Pole v. Randolph*, 570 F.3d 922, 941 (7th Cir. 2009).

To begin, Mata's characteristics made him uniquely vulnerable to coercive interrogation tactics.  He was young (20 years old).  A7 at 3:26-4:01.  He had no prior experience with the criminal justice system.  A186-87.  And he had, at most, a tenth grade education.  A7 at 3:26-4:01; A1641.  *See, e.g.*, *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001) ("Factors relevant to [the voluntariness] determination are the defendant's age, education, intelligence level, and mental state."); *compare Janusiak v. Cooper*, 937 F.3d 880, 893-94 (7th Cir. 2019) (confession voluntary where defendant had a high school diploma and experience with law enforcement), *with Reck v. Pate*, 367 U.S. 433, 442-43 (1961) (confession involuntary where defendant

was 19 years old, dropped out of school at 16, and had no previous interactions with the police).

More importantly, the state's tactics were egregious from every perspective, including its "use of physical punishment," its failure to give "advice about constitutional rights," the "length of detention," and the "nature of the interrogations." *Huerta*, 239 F.3d at 871. When the police arrested Mata, they slammed him against the wall, swarmed his house (with his baby daughter inside), dragged him down a flight of stairs, and repeatedly "pushed" and "poked" him. A8, 22-24, 50, 57, 75. Without giving him *Miranda* warnings (A8, 60), the police ordered Mata to sign a consent form while "face down" on the trunk of a squad car (A50-51). The arrest tactics *alone* poisoned all of the state's subsequent interactions with Mata.

And then things got worse: The police detained Mata for *27 hours* and interrogated him at least four separate times in a small room with no windows. A7, 8, 561, 565, 589, 814, 836, 847; *see, e.g.*, *Davis v. North Carolina*, 384 U.S. 737, 743 (1996) (finding coercion where interrogation was conducted in a "6 by 10 feet" cell with "no view of daylight"). On "breaks" between interrogations, Mata was handcuffed to a wall and forced to stand (A8), depriving him of sleep. *See, e.g.*, *United States v. Sturdivant*, 796 F.3d 690, 695 (7th Cir. 2015) ("deprivation of food or sleep" bears on voluntariness of confession); *United States v. Rivera*, 89 F. Supp. 3d 376, (E.D.N.Y. 2015) (noting coercive effect of "long restraint in handcuffs"). Then, on top of all this, the police threatened to arrest his fiancée (A8, 1416, 1643) and to have his one-year-old daughter taken away by the state (A8, 1034, 1416, 1643).

42

This Court has held that "explicit threats to a suspect's custody of a young child are *presumed* to be coercive" on their own. *Lentz v. Kennedy*, 967 F.3d 675, 691 (7th Cir. 2020) (emphasis added); *see also Sornberger v. City of Knoxville*, 434 F.3d 1006, 1023 (7th Cir. 2006) ("Threats to a suspect's family or children, even if implicit, certainly may render confessions involuntary."); *Haynes v. State of Wash.*, 373 U.S. 503, 514 (1963) (confession involuntary where it was "induced by the promise of communication with and access to [a suspect's] family"). But the *totality* of physical and psychological abuse would have led just about anyone in Mata's shoes to confess.

In light of this evidence, the Appellate Court's decision was remarkable. It dismissed all of these facts because they "contradicted" (1) the testimony of "Detective Bor, Detective Smith, and ASA Mojica"; and (2) "the videotaped statement" *itself*. A1627; SA34. The state's witnesses said that "they advised [Mata] of his *Miranda* rights" and "he understood them." *Id.* Mata, for his part, said that the "detectives and ASA had treated him well"; that they "provid[ed] him with sustenance"; and "that he was making the statement freely and voluntarily absent threat or promise in exchange." *Id.* On these grounds—which the district court adopted—the Appellate Court concluded that Mata's motion "had no likelihood of success." A1628; SA35.

A motion to suppress, however, cannot be denied merely because it is based on *disputed* allegations. To be sure, the trial court may have credited the testimony of the state's witnesses, but that is exactly why an evidentiary hearing was necessary. There is also very good reason to believe that the trial court would *not* have believed the state's witnesses, given that it found "enormous" "credibility issues" with the

testimony of those very witnesses when it granted Mata's Fourth Amendment motion. A220. The state court, bizarrely, held that victory against Mata, finding that it was "especially" appropriate to "presume" that counsel's strategy was "sound" because "counsel successfully argued a motion to suppress evidence seized at the time of the arrest." A1627-28. But the opposite is true: The grant of that motion was a strong indication that the trial court was inclined to throw out *all* of the fruits of the arrest.

The Appellate Court's reliance on the video is even more baffling. A statement made in an allegedly *coerced confession* cannot support a finding that the statement was *not coerced*. Under the state court's logic, if Mata was held at gunpoint and ordered to confess, the state could use the confession so long as it also coerced Mata into *saying* it was voluntary. That would make the coercion inquiry meaningless.

But even when viewed in isolation, the content of the video is exceedingly dubious. Mata's statements were staged: Rather than telling his story in his own words, he was directed to say "yes" or "no" to statements crafted by ASA Mojica. *See* p. 7 *supra*. When Mojica asked Mata if he had been treated fairly, Mata gestured to Detective Smith and replied (robotically): "Yes, Mr. Smith here has treated me well, and I didn't give no bad attitude towards nobody here." A7 at 20:38-20:46. When Mata was asked about what he had for breakfast and dinner, he said that he had consumed a "hash brown and a pop" for breakfast and "a soda pop and . . . a nice big slice of pizza" for dinner. *Id.* at 20:54-21:22. The officers, he affirmed, had been kind enough to let him use the bathroom when necessary. *Id.* at 21:35-21:39. And when ASA Mojica told Mata—nominally in question form—that "no one ha[d] made any

44

threats or promises," Mata responded: "No, no they haven't." *Id.* at 21:52-21:56.
Nothing about the exchange was genuine.

Because Jones had no strategic reason for failing to pursue Mata's motion to
suppress, and because the motion was meritorious, his performance was deficient.
The state court's decision was an unreasonable determination of law and fact.

### B. Mata Was Prejudiced By Counsel's Deficient Performance.

Because the state court rested its merits decision solely on *Strickland*'s
performance prong, the prejudice test is not subject to AEDPA deference. *Blackmon
v. Williams*, 523 F.3d 1099, 1105 (7th Cir. 2016) ("The state court never reached the
prejudice question, so we review *de novo* that prong of *Strickland*."). If the Court
holds that Mata's motion to suppress had merit (*see* Part I.A.2 *supra*), the remaining
question is whether Mata was prejudiced by the admission of his confession at trial.
*See Gilbert v. Merchant*, 488 F.3d 780, 790-91 (7th Cir. 2007) (when counsel fails to
file a motion to suppress, a showing of the motion's merit "suppl[ies] partial proof of
prejudice, by establishing that the suppression motion would have removed [the]
confession from the State's case"). There is, at minimum, "a reasonable probability"
that if the confession had been suppressed, "the result of the proceeding would have
been different." *Strickland*, 466 U.S. at 693-94; *see Julian v. Bartley*, 495 F.3d 487,
498 (7th Cir. 2007) ("The chances of prejudice need be only better than negligible.").

And on this subject, we agree with the Illinois Appellate Court: "The most
salient evidence the State presented against [Mata], and the most critical to proving
his guilt beyond a reasonable doubt, was the video statement." A1508; SA10. The
state played the full video during its case-in-chief. A569. It relied on the video to

impeach Mata's testimony. *See* p. 19 *supra*. And it made multiple references to Mata's confession during closing arguments, urging the jury to "[r]emember the video" (A1268), to disbelieve anything he said at trial that was "totally different than [what] he said on the videotape[d] statement" (A1299), and to conclude that he cried "crocodile tears" on the witness stand because he did not *also* cry on the video (A1310).

The state's approach was no surprise, because Mata's trial was a classic dual of conflicting testimony. The witnesses were all over the place; many agreed with Mata's account, others agreed with the state's, and each had different vantage points and motivations. *See* pp. 15-20 *supra*. But the state was able to consistently use the video to rebut Mata's evidence. And because Jones was *unable* to elicit testimony about the coercion used to obtain the confession—he waited too long to try—he could not even *argue* to the jury that the confession was involuntary. There is no other way of putting it: Mata was convicted because of his own lawyer.

## CONCLUSION

The Court should reverse the decision below and direct the district court to grant Mata's petition for writ of habeas corpus. In the alternative, the Court should vacate the judgment below and remand to the district court to conduct an evidentiary hearing on Mata's claim for ineffective assistance of counsel.

Respectfully submitted,                    /s/ Michael Rayfield

                                           Michael Rayfield
                                           MAYER BROWN LLP
                                           1221 Avenue of the Americas
                                           New York, NY 10020
                                           (212) 506-2500

                                           *Counsel for Roberto Mata*


Dated:  April 27, 2022

## CERTIFICATE OF COMPLIANCE WITH RULE 32

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), I certify that this brief:

(i)     complies with the type-volume limitation of Rule 32(a)(7)(B), as modified by Circuit Rule 32, because it contains 12,783 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii)     complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6), as modified by Circuit Rule 32, because it has been prepared using Microsoft Office Word 2016 and is set in Century Schoolbook font, size 12 points.


Dated:  April 27, 2022                    /s/ Michael Rayfield

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(d)**

Pursuant to Circuit Rule 30(d), I certify that all materials required by Circuit

Rules 30(a) and (b) are included in the appendix bound with this brief.


Dated:  April 27, 2022                    /s/ Michael Rayfield

## CERTIFICATE OF SERVICE

I certify that on April 27, 2022, the foregoing brief and appendix were served electronically via the Court's CM/ECF system upon all counsel of record.


Dated:  April 27, 2022                    /s/ Michael Rayfield

# REQUIRED SHORT APPENDIX

## *Contents*

Illinois Appellate Court's decision on direct appeal (December 17, 2007) ............ SA1

Illinois Circuit Court's order denying post-conviction petition
    (September 18, 2008) ................................................................ SA17

Illinois Appellate Court's decision affirming post-conviction decision
    (June 17, 2011) ...................................................................... SA27

Illinois Supreme Court's denial of leave to appeal (January 4, 2012) ................. SA36

District court's order denying petition for writ of habeas corpus under
    28 U.S.C. § 2254 (September 21, 2020) .......................................... SA37

This Court's certificate of appealability (March 11, 2021) ................................ SA59

## *Certificate*

Pursuant to Circuit Rule 30(d), I hereby certify that this short appendix includes all the materials required by Circuit Rule 30(a).

Dated: April 27, 2022

/s/ Michael Rayfield
Michael Rayfield

*Counsel for Appellant*

NOTICE

The text of this order may be changed or corrected prior to the time for filing of a Petition for Rehearing or the disposition of the same.

*affirmed*
*12-17-07*

FIRST DIVISION
December 17, 2007

ANJANA HANSEN—

No. 1-05-0527

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

07-1370

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 02 CR 9220 |
| | ) | |
| ROBERTO MATA, | ) | Honorable |
| | ) | Wilbur E. Crooks, |
| Defendant-Appellant. | ) | Judge Presiding. |

## O R D E R

Following a jury trial, defendant Roberto Mata was convicted of two counts of first degree murder and one count of aggravated battery with a firearm and sentenced to two natural-life terms and 10 years' imprisonment to be served consecutively. On appeal, defendant contends that (1) he was denied effective assistance of counsel because his trial counsel failed to impeach the State's only witness with prior inconsistent statements and (2) the mittimus should be corrected to a single natural-life sentence because no sentence can be served consecutively to a natural-life term. We affirm and order the mittimus corrected.

Sandar Mosqueada and Adrian Padilla were shot and killed in the early morning hours of March 16, 2002. Edwin Delgado was also shot during the incident but survived his injury. According to the State's theory of the case, the shootings occurred as a

EXHIBIT D

1-05-0527

result of a physical altercation on the street between Delgado and defendant's friend, Reynaldo Mares.  Mares called out to defendant for help, and defendant pulled out a gun.  Though the altercation had ended and Delgado and Padilla were attempting to retreat, defendant nonetheless shot at Delgado and Padilla, along with their friend Mosqueada, who was not involved in the incident but was in the area at the time.  Defendant argued that he was acting in self-defense, or in the alternative, unreasonably believed that such force was necessary to defend Mares.

The sole witness testifying for the State was Edwin Delgado. Delgado testified that on March 15, 2002, he was visiting his cousin when he received a call from his friend Adrian Padilla. Delgado met Padilla and another friend, William Rivera, in Padilla's parked car on the 2000 block of 18th Place in Chicago. The three men drank beer and talked for some time.  Rivera then left the car to attend a party nearby, while Delgado and Padilla remained in the car.  Shortly after 2 a.m., Delgado decided to return home and he and Padilla left the car.  Delgado walked westbound down 18th Place on the south side of the street. Padilla remained behind to lock his car door, then began walking westbound on the opposite side of the same street.  Delgado testified that the area through which the two men were walking is Satan Disciple gang territory, and both Delgado and Padilla were members of the Satan Disciples gang at that time.

- 2 -

SA0002

1-05-0527

As Delgado began to cross to Padilla's side of the street, he noticed two men and two women walk out of a gangway on 18th Place two or three houses to the west of Padilla. The women exited the gangway first and began walking westbound, followed by the men, later identified as defendant and Reynaldo Mares. Mares wore a Houston Astros' baseball cap with a cracked five-point star on it. Delgado testified that a cracked five-point star symbolized respect to the "Folks nation", to which the Satan Disciples belong. However, Delgado testified that Satan Disciples in that neighborhood never wear Houston Astros baseball caps. Padilla asked Mares who he was. Mares told Padilla to, "fuck off," then began running westbound toward Delgado, who had crossed over to the north side of 18th Place. Mares struck Delgado in the chest and Delgado pinned Mares to the ground. Mares then called for help to defendant, who was standing approximately eight feet away, further west on 18th Place. Defendant, standing in close proximity, drew a gun and pointed it at Delgado. When Delgado saw the gun pointed at him, he let go of Mares and began backing away. Before Delgado could turn around and run, he was shot in his buttocks. Delgado testified that he heard six shots fired in his direction. He saw that Padilla had also been hit by gunfire.

Delgado and Padilla then began running southeast in an attempt to flee from defendant, and Delgado fell down in the

- 3 -

**SA0003**

1-05-0527

middle of the street. Defendant walked around a van parked in
the street directly in front of him and began firing southwest at
another man, whom Delgado couldn't see at the time but later
realized was his friend Mosqueada. Defendant then came back
across the van and again began firing at Delgado and Padilla.
The gunfire missed Delgado but hit Padilla, who "fell like a
brick." Defendant then began running westbound on 18th Place and
got in a white car waiting for him a short distance away. On
cross-examination, Delgado acknowledged that one portion of his
direct examination testimony was inconsistent with statements he
previously made to police investigators and before a grand jury.
In contrast to Delgado's trial testimony that the shooting was
precipitated by an altercation between Delgado and Mares, he
testified before the grand jury and stated to police that it was
Padilla who had fought with Mares before the shooting and Padilla
who instigated the altercation. Counsel elicited the following
testimony:

> "Q. Mr. Delgado, when the man with the
> baseball cap came out of the gangway you said
> that he ran west on 18th Place?
>
> > A. Yes.
> >
> > Q. What happened then?
> >
> > A. He struck me.
> >
> > Q. What happened?

- 4 -

1-05-0527

> A.   I pinned him down to the floor."

Then, counsel impeached Delgado concerning the testimony he had previously given before the grand jury:

> "Q.   Was it your statement then that the
> male wearing the baseball hat ran away down
> 18th Place when Adrian [Padilla] pushed him
> and he fell to the ground, is that true?
>
> A.   At that time I had said that, but it
> was me that pushed him down."

On re-direct examination, Delgado stated that he did not tell the truth in those initial statements because he did not want to be charged with battery of Mares.

Delgado provided other inconsistent testimony, however, that was not impeached by trial counsel. In his grand jury testimony and written statement to police, Delgado also stated that he was on his way home from his cousin's house when the altercation ensued, and did not mention the time he spent with Padilla in his car. Concerning the actual shooting, he said defendant had fired only one round of six or seven shots in total. On the issue of gang affiliation, Delgado claimed in his written statement that the five-pointed star insignia on Mares' Houston Astros' baseball cap represented the "People's nation," a rival of the Folks.

Defendant gave a videotaped statement to police two days after the shootings which the State entered into evidence at

- 5 -

**SA0005**

1-05-0527

trial.  He stated that on the night in question, he attended a
housewarming party with his girlfriend Esmeralda Herrera at 2120
West 18th Place in Chicago.  Several friends and acquaintances of
his were at the party, including Reynaldo Mares, Chad Cruz, and
Karina Pinedo.  Defendant carried his loaded .40 caliber
semiautomatic handgun, which he said he had found a few months
prior in a park near his home in Aurora and kept for protection.
During the party, two Hispanic men arrived who were unknown by
anyone at the party.  They smoked marijuana and left a short time
later without incident.

     Subsequently, defendant left the party with Herrera, Mares,
Cruz, and Pinedo.  Defendant and Herrera were walking ahead of
Mares when Mares called out to him.  When defendant looked behind
him, he saw the same two men who had recently been at the party
holding Mares by his arms, while two other Hispanic men
surrounded him.  Defendant took out his gun and fired one shot in
the direction of the four men.  The men backed away and defendant
moved toward Mares to help him up, but one of the men reached for
his pocket in what defendant feared was an attempt to draw a
weapon.  Defendant then fired five more shots in the direction of
the men.  When he fired the shots, all of the men had their backs
turned to defendant and had begun walking away.  Defendant never
actually saw a weapon on any of the men and no weapons were found
on the victims.  Defendant, Mares, Herrera, Cruz, and Pinedo then

- 6 -

SA0006

1-05-0527

ran west towards Herrera's car parked a short distance away.

At trial, defendant's testimony differed from his videotaped statement. Concerning the altercation on the street, defendant testified that three to four men, two of whom were the uninvited guests from the party, were beating Mares, repeatedly kicking and punching him. According to defendant, he first fired one shot in the air in order to help Mares. The men backed up but did not leave. As he went to assist Mares off the ground, he saw one of the men reach toward his waist. Defendant then fired his gun a few more times but did not know how many. As he and Mares ran toward Herrera's car, he heard gun shots fired and when he was inside her car, he saw a man running down the street shooting a gun.

Sandy Diaz, Nicole Bell, Herrera, Pinedo, and Mares all testified for defendant. Each testified that they attended the housewarming party on March 15, 2002, and left the party together with defendant shortly after 2 a.m. Herrera and Mares testified that after the shootings occurred, they saw an unknown man running down the street firing a handgun. Diaz and Bell testified that they walked eastbound on 18th Place, in the opposite direction of defendant, Mares, and Herrera. Each testified that as they were crossing the street to get to Diaz' car, they heard gunshots coming from a van that was driving down the street. Bell testified that the person in the van was

- 7 -

1-05-0527

shooting at her and Diaz.

On cross-examination, Herrera and Mares each acknowledged that in the statements they made to police investigators and the grand jury, they did not mention seeing a man running down the street with a gun. Mares also identified a picture of himself taken on March 18, 2002, showing no visible injuries on his face as a result of the alleged beating by the two men on March 15, 2002.

In rebuttal, two assistant State's Attorneys testified concerning Mares' handwritten statement to police and testimony before the grand jury. In that statement, Mares said that he and defendant were members of the Neutron Latin Kings and that the Houston Astros' baseball cap he wore on the night of the shootings was a symbol of the Latin Kings.

The jury found defendant guilty of the first-degree murders of Padilla and Mosqueada and the aggravated battery with a firearm of Delgado. The court sentenced defendant to two natural-life terms for the murders of Padilla and Mosqueada and to 10 years' imprisonment for the aggravated battery of Delgado, to be served consecutively.

On appeal, defendant first contends that he was denied effective assistance of counsel because his trial counsel failed to impeach Delgado with prior inconsistent statements. Specifically, defendant argues, counsel should have impeached

- 8 -

1-05-0527

Delgado's trial testimony regarding (1) his whereabouts on the
night of the murders prior to arriving at the scene of the crime
(2) who instigated the altercation that preceded the shooting (3)
how many shots defendant fired and the sequence of the shooting
and (4) the significance of the Houston Astros' hat worn by
Mares.  Defendant contends that had trial counsel elicited these
contradictions, it would have cast doubt on whether Delgado was
credible and whether his recollection of events was reliable.

The Illinois Supreme Court has adopted the two-prong test
for claims of ineffective assistance of counsel first established
in Strickland v. Washington, 466 U.S. 668, 80 L. Ed.2d 674, 104
S. Ct. 2052 (1984).  People v. Albanese, 104 Ill. 2d 504, 525
(1984), citing Strickland, 466 U.S. at 687.  First, a defendant
must demonstrate that defense counsel's performance fell below an
objective standard of reasonableness.  Albanese, 104 Ill. 2d at
525.  Second, he must establish that a reasonable probability
exists that, but for defense counsel's unprofessional errors, the
result of the proceeding would have been different.  Albanese,
104 Ill. 2d at 525.  A reasonable probability is a probability
sufficient to undermine confidence in the outcome, namely, that
counsel's deficient performance rendered the result of the trial
unreliable or the proceeding fundamentally unfair.  People v.
Enis, 194 Ill. 2d 361, 376 (2000).  The failure to satisfy either
the deficiency prong or the prejudice prong of the Strickland

- 9 -

SA0009

test precludes a finding of ineffective assistance of counsel. *Enis*, 194 Ill. 2d at 377.

We find that defendant has failed to show that he was prejudiced by the alleged errors. Even assuming, *arguendo*, that trial counsel's failure to impeach Delgado with prior inconsistent statements constituted substandard representation, it would not have altered the result in this case because the evidence of defendant's guilt was overwhelming.

The most salient evidence the State presented against defendant, and the most critical to proving his guilt beyond a reasonable doubt, was the videotaped statement provided by defendant. In that statement, defendant provided a detailed account of the circumstances surrounding the shootings and the manner in which they occurred. Defendant described how he heard Mares call out for help, turned around to see that Mares was being held by two men and surrounded by two others, and reacted by taking out his gun and shooting in the direction of the four men. In that statement, defendant did not contend that Mares was being beaten by the men, nor did he claim that he had seen any of the men reach for a weapon at that point. He nonetheless responded with deadly force. According to defendant, the men backed away and he moved toward Mares to help him up. Defendant then saw one of the men reach for his pocket so he fired five more shots in the direction of the men. When he fired the second

- 10 -

**SA0010**

1-05-0527

series of shots, defendant conceded, all of the men had their
backs turned to him and had begun walking away.  Defendant never
actually saw a weapon on any of the men and no weapons were found
on the victims.

Moreover, the unimpeached inconsistencies in Delgado's
testimony that defendant here sets forth concern facts that,
while not completely trivial, are nonetheless inconsequential to
the issue on which the jury was asked to render its verdict.
Throughout his statements, Delgado's recollection remained
consistent concerning the most material and crucial facts of
March 16, 2002, and hence, those most important to his
credibility.  Thus, even had these non-material inconsistincies
been elicited, they would not have significantly damaged
Delgado's crediblity or created reasonable doubt as to
defendant's guilt.  To illustrate, we consider in turn each of
the alleged unimpeached inconsistencies in Delgado's statements.

Defendant first argues that Delgado provided inconsistent
statements concerning his whereabouts on March 16, prior to
arriving on the crime scene.  He told the grand jury and police
investigators that he had just left his cousin's house and was
heading home, while he testified at trial that he had been with
Padilla in his car conversing and drinking beers before his
encounter on the street with defendant and Mares.  These
statements, while inconsistent, essentially concern background

- 11 -

**SA0011**

1-05-0527

information relating to the night of the incident.  The most
relevant point from each of the statements Delgado provided, that
he was walking down 18th Place shortly after 2 a.m., is
consistent.

Delgado's trial testimony regarding his account of the
shooting and its aftermath was somewhat different from the one he
provided to police and before the grand jury.  Most notably, at
trial, Delgado described a second volley of shots fired by
defendant at him and Padilla after defendant shot at a man he
later learned was Mosqueada.  His grand jury testimony and
written statement, conversely, describe only one round of six or
seven shots fired at him and Padilla.  These inconsistencies in
Delgado's statements concern his recollection of the manner in
which events unfolded after he had been shot and was attempting
to seek refuge from further gunfire.  Delgado consistently stated
that defendant fired no less than six shots at him and Padilla,
and that neither he nor Padilla carried a weapon that night.

Next, defendant argues that Delgado's trial testimony
regarding the significance of Mares' Houston Astros baseball cap
differed from his grand jury testimony and written statement to
police.  At trial, Delgado testified that the insignia was a sign
of respect to the Folks nation, while in his written statement
Delgado claimed that the insignia represented the People's
nation, a rival of the Folks.  We find this inconsistency to be

- 12 -

**SA0012**

1-05-0527

insignificant.  Delgado testified that both he and Padilla were
members of the Satan Disciples gang at the time of the incident,
which is affiliated with the Folks nation.  While he did state
that he interpreted Mares' Astros hat to be a sign of respect to
the Folks nation, he also stated that no one in that neighborhood
ever wore this type of hat, arousing their suspicion.  Thus,
regardless of which gang it represented, Mares wore gang
affiliated clothing that was out of place in the neighborhood.
This prompted Padilla to confront Mares and the altercation
ensued from there.

Finally, we consider defendant's assertion that his trial
counsel did not impeach Delgado for his inconsistent statements
concerning who was the initial aggressor in the altercation which
preceded the shooting.  Through a close reading of the record, we
find that this prior inconsistent statement by Delgado was in
fact elicited.  On cross-examination at trial, counsel elicited
the following testimony:

> "Q. Mr. Delgado, when the man with the
> baseball cap came out of the gangway you said
> that he ran west on 18th Place?
>
>     A.   Yes.
>
>     Q.   What happened then?
>
>     A.   He struck me.
>
>     Q.   What happened?

- 13 -

1-05-0527

      A.  I pinned him down to the floor."

Then, counsel impeached Delgado concerning the testimony he had previously given before the grand jury:

      "Q.  Was it your statement then that the
      male wearing the baseball hat ran away down
      18th Place when Adrian [Padilla] pushed him
      and he fell to the ground, is that true?

      A.  At that time I had said that, but
      it was me that pushed him down."

Thus, at trial Delgado testified that Mares began to run away and as he crossed paths with Delgado, he struck Delgado, who then pinned him to the ground. This contradicts his grand jury testimony and written statement brought out at trial that as Mares attempted to run away, Padilla pushed him down. Delgado was thus impeached not only as to which individuals were involved in the altercation, but who threw the first blow. The jury heard this impeachment and had the opportunity to weigh this inconsistent statement in assessing Delgado's credibility as a witness.

Therefore, Delgado was impeached on the most significant inconsistent statement he made, while the fact that there were some unimpeached inconsistencies in Delgado's prior statements concerning how he arrived at the scene of the shooting and the details of how the shootings occurred does not provide reasonable

- 14 -

**SA0014**

1-05-0527

doubt as to defendant's guilt; and thus, counsel's failure to
impeach Delgado with his prior statement did not prejudice
defendant. See <u>People v. Nitz</u>, 143 Ill. 2d 82, 116 (1991)
(holding failure of counsel to impeach a witness with minor
inconsistencies from prior testimony did not amount to
ineffective assistance of counsel because defendant was not
prejudiced when the minor inconsistencies did not create
reasonable doubt as to his guilt). Therefore, defendant's
ineffective assistance of counsel claim is rejected.

    Defendant next contends that one of his natural life
sentences should be vacated and his 10-year sentence for
aggravated battery with a firearm should be served concurrently.

    The Illinois Supreme Court has recognized the impossibility
of serving consecutive natural life sentences both according to
natural law and within the plain meaning of the consecutive
sentencing law, section 5-8-4(a) of the Unified Code of
Corrections. 730 ILCS 5/5-8-4(a) (West 2000). <u>People v. Palmer</u>,
218 Ill. 2d 148, 164 (2006). It belabors the obvious to state
that at the conclusion of a defendant's first natural-life
sentence, his life is over. Palmer, 218 Ill. 2d at 167. Further,
the Department of Corrections cannot enforce an order imposing
another natural-life sentence consecutive to it. <u>Palmer</u>, 218
Ill. 2d at 167. Thus, consecutive natural-life sentences cannot
follow in a series one after another. There is only one way in

- 15 -

1-05-0527

which a defendant can serve the sentences, with his one life.
Palmer, 218 Ill. 2d, 148, 168.  Therefore, the sentences may not
be consecutive, but must be concurrent because concurrent
sentences are sentences which operate simultaneously. Palmer, 218
Ill. 2d at 167; Black's Law Dictionary 1393 (8th ed. 2004).

By the same reasoning, it is impossible to serve a term of
years sentence consecutive to life without parole because the
only way a defendant can serve his natural life sentence is with
his one life.  People v. Dixon, 366 Ill. App. 3d 848, 856 (2006);
Palmer, 218 Ill. 2d at 168.

Pursuant to Supreme Court Rule 615(b), this Court may
correct the mittimus without remanding the case to the trial
court.  134 Ill. 2d R. 615(b)(1).  Accordingly, we affirm the
judgment of the circuit court of Cook County and order the clerk
of the circuit court to correct the mittimus to reflect two
concurrent sentences of natural life for first degree murder with
a concurrent 10-year term for aggravated battery with a firearm.

Affirmed; mittimus corrected.

GARCIA, J., with CAHILL, P.J., and WOLFSON, J., concurring.

- 16 -

**SA0016**

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CRIMINAL DIVISION**

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | |
| | ) | |
| | ) | |
| | ) | 02-CR-9220 |
| v. | ) | |
| | ) | |
| | ) | |
| | ) | |
| ROBERTO MATA, | ) | |
| | ) | |
| Defendant-Petitioner. | ) | |
| | ) | |

## ORDER

Petitioner, Roberto Mata, seeks relief from the judgment of conviction entered against him on February 17, 2005. On that date, following a jury trial, petitioner was found guilty of two counts of first degree murder and one count of aggravated battery with a firearm in violation of Sections 9-1 and 12-4.2 of the Illinois Criminal Code, 720 ILCS 5/9-1 (A)(1) & 12-4.2 (A)(1) (West 1992), and was subsequently sentenced to life imprisonment. As grounds for relief, petitioner asserts that (1) the State committed prosecutorial misconduct when it withheld evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed. 2d 215 (1963); (2) he was denied the effective assistance of trial counsel; and (3) appellate counsel was ineffective for failing to raise issues on direct appeal.

## BACKGROUND

Sandar Mosqueada and Adrian Padilla were shot and killed in the early morning hours of March 16, 2002. Edwin Delgado was also shot during the incident but survived his injury. According to the State's theory of the case, the shootings occurred as a result of a physical altercation on the street between Delgado and petitioner's friend, Reynaldo Mares. Mares called out to petitioner for help, and petitioner pulled out a gun. Though the altercation had ended and Delgado and Padilla were attempting to retreat, petitioner nonetheless shot at Delgado and Padilla, along with their friend Mosqueada, who was not involved in the incident but was in the area at the time.

## PROCEDURAL HISTORY

Petitioner filed a direct appeal in the Illinois Appellate Court, First Judicial District, alleging that he was denied the effective assistance of counsel because his trial counsel failed to impeach the State's only witness with prior inconsistent statements and the mittimus should be corrected to a single natural-life sentence because no sentence can be served consecutively to a natural life sentence. On December 17, 2007, the court affirmed petitioner's conviction and ordered the mittimus be corrected to make petitioner's sentences run concurrent to each other. *People v. Mata,* No. 1-05-0527 (unpublished order under Rule 23) (2007).

## ANALYSIS

The instant petition was filed on June 25, 2008, and is before the court for an initial determination of its legal sufficiency pursuant to Section 2.1 of the Post-Conviction Hearing Act (hereinafter the "Act"). 725 ILCS 5/122-2.1 (West 2002); *People v. Holiday,* 313 Ill. App. 3d 1046, 1048, 732 N.E.2d 1, 2 (2000). A post-

2

conviction petition is a collateral attack on prior judgment, *People v. Simms*, 192 Ill. 2d 348, 359, 736 N.E.2d 1092, 1105 (2000), and is limited to constitutional issues which were not and could not have been raised on direct appeal. *People v. King*, 192 Ill. 2d 189, 192, 735 N.E.2d 569, 572 (2000). Where the petitioner raises non-meritorious claims, the court may summarily dismiss them. *People v. Richardson*, 189 Ill. 2d 401, 407, 727 N.E.2d 362, 367 (2000).

Under the Act, a petitioner enjoys no entitlement to an evidentiary hearing. *People v. Cloutier*, 191 Ill. 2d 392, 397, 732 N.E.2d 519, 523 (2000). In order to obtain a hearing, the petitioner has the burden of establishing that a substantial violation of his constitutional rights occurred at trial or sentencing. *People v. Johnson*, 191 Ill. 2d 257, 268, 730 N.E.2d 1107, 1111 (2000). However, a *pro se* post-conviction petition may be summarily dismissed as frivolous or patently without merit during the first stage of post-conviction review unless the allegations in the petition, taken as true and liberally construed, present the "gist" of a valid constitutional claim. *People v. Edwards*, 197 Ill. 2d 239, 244, 757 N.E.2d 442, 445 (2001).

Further, a post-conviction proceeding is not a direct appeal, but rather is a collateral attack on prior judgment. *People v. Barrow*, 195 Ill. 2d 506, 519, 749 N.E.2d 892, 901 (2001). Therefore, the issues raised on post-conviction review are limited to those that could not be or were not previously raised on direct appeal or in prior post-conviction proceedings. *People v. McNeal*, 194 Ill. 2d 135, 140, 742 N.E.2d 269, 272 (2001).

Petitioner contends that the State intentionally withheld exculpatory evidence. Specifically, petitioner claims that the State refused to tell the defense the whereabouts of

C : 00061

**SA0019**

William Riviera, who he alleges gave a statement to both the Chicago Police and the Grand Jury which contradicted the testimony of Edwin Delgado.

Clearly, due process prohibits the suppression by the State of information or materials favorable to the petitioner and material to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 218, 83 S. Ct. 1194, 1196-97 (1963); *United States v. Bagley*, 473 U.S. 667, 682, 87 L. Ed. 2d 481, 493, 105 S. Ct. 3375, 3383 (1985). "Moreover, the disclosure obligation applies to impeachment evidence as well." *People v. Pecoraro*, 175 Ill. 2d 294, 305, 677 N.E.2d 875, 881 (1997) (citations omitted).

The standard for materiality under *Brady* is whether there is a reasonable probability that disclosure of the evidence to the defense would have altered the outcome of the proceeding. *People v. Sanchez*, 169 Ill. 2d 472, 486, 662 N.E.2d 1199, 1207 (1996); *Bagley*, 473 U.S. at 682, 87 L. Ed. 2d at 494, 105 S. Ct. at 3383. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Id.*

Petitioner has not met the standard outlined above. A review of the statements provided by Mr. Riviera to the grand jury and Chicago Police, reveal that he stated that petitioner and a guy in an Astro's baseball cap were fighting with his friends when petitioner pulled out a gun and began shooting, hitting the two victims in this case. Tr. at 10-12. Thus, petitioner has failed to show that any potential testimony provided by Mr. Riviera would have been exculpatory. Indeed, his testimony would only have bolstered the State's case.

Petitioner also claims trial counsel was ineffective. In examining petitioner's claims of ineffective assistance of counsel, this court follows the two-pronged test of

4

C : 00062

**SA0020**

*Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). Under this standard, petitioner must show that counsel's representation fell below an objective standard of reasonableness, and that because of this deficiency, there is a reasonable probability that counsel's performance was prejudicial to the defense. *People v. Hickey*, 204 Ill. 2d 585, 613, 792 N.E.2d 232, 251 (2001). "Prejudice exists when 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *People v. Erickson*, 183 Ill. 2d 213, 224, 700 N.E.2d 1027, 1032 (1998) (citations omitted). A petitioner's failure to make the requisite showing of either deficient performance or sufficient prejudice defeats a claim of ineffectiveness. *People v. Morgan*, 187 Ill. 2d 500, 529-30, 719 N.E.2d 681, 698 (1999).

Significantly, effective assistance of counsel in a constitutional sense means competent, not perfect, representation. *People v. Easley*, 192 Ill. 2d 307, 344, 736 N.E.2d 975, 999 (2000). Notably, courts indulge in the strong presumption that counsel's performance fell within a wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 690, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066; *People v. Edwards*, 195 Ill. 2d 142, 163, 745 N.E.2d 1212, 1223 (2001). Moreover, "the fact that another attorney might have pursued a different strategy is not a factor in the competency determination." *People v. Palmer*, 162 Ill. 2d 465, 476, 643 N.E.2d 797, 802 (1994) (citing *People v. Hillenbrand*, 121 Ill. 2d 537, 548, 521 N.E.2d 900, 904 (1988)).

Further, counsel's strategic decisions will not be second-guessed. Indeed, to ruminate over the wisdom of counsel's advice is precisely the kind of retrospection proscribed by *Strickland* and its progeny. *See Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at

5

694, 104 S. Ct. at 2065 ("[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight"); *see also People v. Fuller*, 205 Ill. 2d 308, 331, 793 N.E.2d 526, 542 (2002) (issues of trial strategy must be viewed, not in hindsight, but from the time of counsel's conduct, and with great deference accorded counsel's decisions).

A court need not consider whether counsel's performance was deficient prior to examining the prejudice suffered by the defendant as a result of the alleged deficiencies. *Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069. Where ineffectiveness can be disposed of on the ground that the defendant did not suffer sufficient prejudice, the court need not determine whether counsel's performance constituted less than reasonably effective assistance. *People v. Flores,* 153 Ill.2d 264, 283-284, 606 N.E. 2d 1078, 1087 (1992).

Petitioner claims trial counsel was ineffective for failing to obtain a private investigator to locate and call Mr. Riviera. Defense counsel's failure to adequately prepare for trial or to conduct adequate investigations may support an ineffectiveness claim. *People v. Witherspoon*, 55 Ill. 2d 18, 21, 302 N.E.2d 3, 4 (1973); *People v. Coleman*, 267 Ill. App. 3d 895, 900, 642 N.E.2d 821, 824 (1st Dist. 1994). However, "a particular decision not to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland v. Washington*, 466 U.S. 668, 691, 80 L. Ed. 2d 674, 695, 104 S. Ct. 2052, 2066 (1984). Indeed, "to prevail on a claim of ineffective assistance for failure to investigate, petitioner must show that substantial prejudice resulted and that there is a reasonable probability the final result would have been different had counsel properly investigated." *People v. Rush*, 294 Ill. App. 3d 334, 342-43, 689 N.E.2d 669, 674 (5th

6

C : 00064

**SA0022**

Dist. 1998). Clearly, in the instant case no prejudice inured from counsel's failure to locate Mr. Riviera since the testimony he would have provided supported the State's theory of the case. Thus, counsel's decision not to hire a private investigator to find Mr. Riviera was reasonable.

Petitioner also claims counsel was ineffective for only meeting with him a limited number of times for a short duration. Even assuming *arguendo* that petitioner's allegations are true, they are insufficient to establish that absent counsel's failures, the outcome of petitioner's proceedings would have been different. See Strickland, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. Petitioner neither alleges nor can he establish any prejudice which resulted from counsel's alleged lack of communication.

Petitioner also claims that counsel was ineffective for advising him to testify in his own behalf. Here, petitioner cannot show that he was prejudiced by his attorney's advice. Indeed, the jury was presented with his videotaped inculpatory statement which the appellate court defined as "salient evidence" of guilt. Had petitioner waived his right to testify, the jury would still have been presented with his statement. Thus, the outcome of his trial would not have changed had he not testified. Moreover, petitioner has failed to overcome the presumption that the complained of action by defense counsel constituted trial strategy. Counsel's advice was likely a trial tactic to get the jury to favor petitioner and to make his version of the events appear more credible and therefore, will not support a claim for ineffectiveness.

Petitioner's final contention is that appellate counsel was ineffective for failing to raise various claims on direct appeal. It is axiomatic that a criminal petitioner is guaranteed the effective assistance of counsel on appeal. *Evitts v. Lucey*, 469 U.S. 387,

C: 00065

**SA0023**

396-97, 83 L. Ed. 2d 821, 829-30, 105 S. Ct. 830, 836-37 (1985). However, effective assistance in a constitutional sense means competent, not perfect, representation. *People v. Easley*, 192 Ill. 2d 307, 344, 736 N.E.2d 975, 999 (2000).

To succeed on a claim of ineffective assistance of appellate counsel, petitioner must show that the failure to raise a particular issue was objectively unreasonable and that his appeal was prejudiced by the omission. *People v. Williams*, 209 Ill. 2d 227, 243, 807 N.E.2d 448, 458 (2004). "Appellate counsel is not obligated to brief every conceivable issue on appeal, and it is not incompetence of counsel to refrain from raising issues which, in his or her judgment, are without merit, unless counsel's appraisal of the merits is patently wrong." *People v. Easley*, 192 Ill. 2d 307, 329, 736 N.E.2d 975, 991 (2000). Thus, petitioner has not suffered prejudice from appellate counsel's decision not to raise certain issues on appeal unless such issues were meritorious. *Easley*, 192 Ill. 2d at 329, 736 N.E.2d at 991.

Petitioner claims that the trial court erred when it failed to rule on his motion to suppress statements and appellate counsel should have raised that issue on direct appeal. Had counsel raised this issue, however, it would likely have been rejected. The record indicates that trial counsel filed a motion to suppress evidence seized from his home pursuant to a warrantless arrest on April 29, 2003. On April 22, 2004, counsel amended the motion, adding additional claims and asking the court to suppress all evidence obtained from petitioner's house as well as any statements made by him. On May 14, 2004, the court entered an order suppressing the consent to search form signed by petitioner and all evidence gathered as a result of the home search. The court did not suppress petitioner's videotaped statement. Nonetheless, although the court did not

8

mention the statement outright in its ruling, clearly since it was played during the State's case in chief, the court did not suppress that statement. Furthermore, the instant petition is devoid of any facts or argument for why the statement should have been suppressed. Petitioner has never claimed that it was involuntary or the result of coercion. He merely claimed it should be suppressed in addition to all the other evidence obtained as a result of the illegal search and seizure. The trial court clearly disagreed and thus, counsel was not ineffective for failing to raise this meritless issue on appeal.

Petitioner also claims that appellate counsel was ineffective for not raising the issue of trial counsel's own incompetence. Where a petitioner claims that appellate counsel was deficient for failing to raise the issue of trial counsel's ineffectiveness, the focus necessarily must be on trial counsel's performance. *People v. Johnson*, 183 Ill. 2d 176, 187, 700 N.E.2d 996, 1001 (1998); *People v. Coleman*, 168 Ill. 2d 509, 522-23, 660 N.E.2d 919, 927 (1995). As previously discussed, trial counsel's failure to (1) locate Mr. Riviera; (2) meet with him as often as he would have liked; and (3) stop him from testifying in his own defense, does not amount to ineffectiveness. Thus, it cannot be said that appellate counsel's decision to not raise those issues constituted incompetence. Because the court has determined that the underlying claims of ineffectiveness lack support, petitioner's claims of ineffective assistance of appellate counsel likewise are without merit.

Similarly, petitioner's claim that appellate counsel was ineffective for failing to attack trial counsel's decision not to present argument on his motion to suppress statements is without merit. Trial counsel presented argument and testimony on behalf of petitioner's motion to suppress over the course of two days. Counsel's decision

9

C : 00067

**SA0025**

concerning which issues to focus on during a hearing is a matter of trial strategy and, as noted, will not support a claim of ineffectiveness. Moreover, it is noteworthy that counsel was able to convince the court to suppress the consent form as well as all the evidence seized at petitioner's home. Accordingly, it was not unreasonable for appellate counsel not to raise this issue on direct appeal.

## CONCLUSION

Based upon the foregoing discussion, the court finds that the issues raised and presented by petitioner are frivolous and patently without merit. Accordingly, the petition for post-conviction relief is hereby dismissed. Petitioner's request for leave to proceed *in forma pauperis* and for appointment of counsel is likewise denied.

ENTERED: _____

Judge Matthew E. Coghlan
Circuit Court of Cook County
Criminal Division

DATED: *9-19-08*

ENTERED

SEP 19 2008

CLERK OF THE CIRCUIT COURT
CRIMINAL DIVISION

10

C : 00068

SA0026

**NOTICE**
The text of this order may
be changed or corrected
prior to the time for filing of
a Petition for Rehearing or
the disposition of the same.

*affirmed*
*6-17-11*

No. 1-09-0657

**NOTICE**: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

**SIXTH DIVISION**
June 17, 2011

STACIA  WEBER ——

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

11-589

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the<br>) Circuit Court of |
| Plaintiff-Appellee, | ) Cook County. |
| | ) |
| v. | ) No. 02 CR 9220 |
| | ) |
| ROBERTO MATA, | ) Honorable<br>.) Matthew E. Coghlan<br>) and Wilbur E. Crooks, |
| Defendant-Appellant. | ) Judge Presiding. |

PRESIDING JUSTICE GARCIA delivered the judgment of the court.
Justices Cahill and McBride concurred in the judgment.

## ORDER

*HELD*: Defendant filed a *pro se* postconviction petition alleging that trial counsel was ineffective for failing to litigate a motion to suppress defendant's statements as involuntary and that appellate counsel, in turn, was ineffective for failing to argue trial counsel's ineffectiveness. The circuit court summarily dismissed the petition as frivolous and patently without merit. This court affirmed the dismissal because the petition was contradicted by the record.



EXHIBIT G

1-09-0657

Defendant Roberto Mata appeals from the first-stage dismissal of his *pro se* petition filed under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2008)). He contends that he stated a claim of arguable merit that trial counsel was ineffective for failing to litigate a motion to suppress his statements as involuntary. We affirm.

Defendant is currently serving a natural life sentence imposed on his 2005 jury trial convictions of aggravated battery with a firearm and two counts of first degree murder for the gang-related shootings of Sandar Mosqueada, Adrian Padilla, and Edwin Delgado. Defendant's convictions rested largely on the testimony of Delgado, the only victim to survive, and defendant's videotaped confession, which this court has reviewed. Defendant did not deny shooting the victims, but advanced a defense of second degree murder on the claim that he believed he was justified in the use of deadly force.

Prior to trial, defendant filed a motion to suppress evidence seized from his home and car without a warrant and to suppress all statements as involuntary. In support of the latter allegation, he stated that he was held by police for two days without *Miranda* warnings; he was "poked and profaned," kept in solitary confinement, forced to stand handcuffed to cell walls for hours, and threatened by police officers. Following a severed hearing on the first claim, the court granted the motion to suppress the evidence taken during a warrantless search of defendant's home and car. The court also stated that the motion to suppress statements was still "viable." Defense counsel thereafter mentioned the pending motion to suppress statements three separate times, but no hearing was held on the motion.

The case proceeded to trial. Delgado testified for the State that there was a gang-related

2

1-09-0657

scuffle between him and Reynaldo Mares. Mares struck Delgado in the chest. Delgado then

pinned Mares to the ground but did not strike him, and Mares called to defendant, his long-time

friend, for help. At that point, defendant pointed a gun at Delgado. Delgado released Mares and

turned away, but defendant fired six shots in Delgado's direction, hitting him in the buttocks.

Defendant also shot Delgado's friend Padilla. As Delgado and Padilla attempted to flee,

defendant shot in their direction again. Padilla was shot a second time and fell "like a brick ***

right on the street." Defendant shot in another direction, and Delgado saw his friend Mosqueada

stagger and fall onto the sidewalk. Defendant ran away. Delgado later identified defendant as the

shooter from both a photographic array and a lineup. Defendant was arrested.

Chicago police detectives Kevin Bor and Patrick Smith testified that following defendant's

arrest and at separate times, they advised defendant of his *Miranda* rights. In both instances,

defendant stated that he understood his rights.   Defendant then made a statement that he had left

a party with his girlfriend Esmeralda Herrera, Mares, and several other friends when he saw four

or five men outside. Defendant stated that he heard gunshots and ran away. He later added that

he saw Mares with a gun that "just kind of went off."

The day after his arrest, assistant State's Attorney (ASA) Lizette Mojica interviewed

defendant, with Detective Smith present. She informed defendant of his *Miranda* rights and

stated that she was a prosecutor, not his attorney. Defendant stated he understood his rights.

Defendant elected to make a videotaped statement, and signed a consent form to that effect.

In the videotaped statement, defendant acknowledged that ASA Mojica was not his

lawyer and that she had advised him of his constitutional rights. She advised him again of his

3

1-09-0657

rights on tape, and defendant stated that he understood each one as she read them. Defendant stated that he understood his rights and wished to make the videotaped statement. Free of handcuffs, he identified the signed consent form.

Defendant stated that on the night in question, he had attended a party with his girlfriend, Mares, and others. He brought a loaded handgun. After leaving the party, he witnessed two men he had seen at the party holding Mares and two others surrounding Mares. Mares called out to defendant. Defendant fired one shot in the direction of the four men, and they backed away. As he helped Mares off the ground, defendant saw one of the men reach into his pocket. Defendant feared that man was reaching for a gun and that the altercation was not over because it "looked like they were actually going to stay around." Defendant reacted by firing five more shots in the direction of the men. Their backs were to defendant, and they were walking away. He and his friends then ran to a car and drove away. Defendant admitted that he never saw any of the four men with a weapon.

Defendant stated that the police detectives and ASA had treated him well. He stated that he had been served two meals, as well as beverages, and had been permitted to use the bathroom when needed. Defendant stated that he was making the statement freely and voluntarily and that no one had made any threats or promises in exchange for the statement.

The medical examiner confirmed that Padilla suffered from two gunshot wounds, one to his middle back and one to his chest. The medical examiner testified that the paths of the gunshot wounds were consistent with Padilla moving and running away from the shooter. There were no wounds indicating that he participated in a fight. The medical examiner testified that Mosqueada

4

SA0030

1-09-0657

suffered from a gunshot wound to his shoulder.

Following this evidence, the State rested.

Defendant's theory at trial was second degree murder, *i.e.* although unreasonable under the circumstances, defendant believed he was justified in the use of deadly force. Defendant testified that he saw men beating Mares on the ground, so he fired a warning shot in the air. As he helped Mares up, defendant saw one of the men reach toward his waist. Although defendant admitted he never saw any of the men with a gun, defendant feared for his life, and reacted by firing more shots. He did not recall how many shots or hitting anyone. As defendant ran for the car, he saw a man running down the street shooting a gun.

Herrera and Mares also testified that the group of men beat Mares. They later saw an unknown man with a gun running in the street. Mares saw that man shooting his gun.

The jury found defendant guilty as charged, and he was sentenced to two natural-life terms for murder, plus 10 years for aggravated battery with a firearm, to be served consecutively.

Following his convictions, defendant filed a direct appeal. He argued that defense counsel was ineffective for failing to impeach Delgado with prior inconsistent statements and consecutive sentences were improper. This court affirmed his conviction and corrected the mittimus to reflect concurrent-term sentences. *People v. Mata*, No. 1-05-0527 (2007) (unpublished order under Supreme Court Rule 23).

In 2008, defendant filed the instant postconviction petition. He alleged, *inter alia,* that defense counsel was ineffective for failing to argue the videotaped statement should be suppressed. He alleged that appellate counsel, in turn, was ineffective for failing to raise that

5

1-09-0657

issue. Defendant alleged that had the trial court considered the motion to suppress, the court would have granted it.

The circuit court summarily dismissed defendant's petition as frivolous and patently without merit. Defendant appealed.

We review the first-stage summary dismissal of a postconviction petition *de novo*. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009).

The Act provides a method by which persons under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution, the Illinois Constitution, or both. 725 ILCS 5/122-1 *et seq.* (West 2008); *Hodges*, 234 Ill. 2d at 9. A *pro se* postconviction petition may be summarily dismissed as frivolous and patently without merit if it has no arguable basis in law or fact, *i.e.* if it is based on an indisputably meritless legal theory or a fanciful factual allegation. *Hodges*, 234 Ill. 2d at 11-12, 16-17.

Defendant contends his petition is sufficient to survive summary dismissal under the Act because he stated a claim with arguable merit that trial counsel was ineffective for failing to litigate his motion to suppress statements as involuntary.

The State initially responds that defendant waived this claim by failing to raise it on direct appeal. See *People v. Harris*, 224 Ill. 2d 115, 124-25 (2007).

We agree with the State. Although trial counsel filed the motion to suppress statements as involuntary, he apparently abandoned the motion. The State played defendant's videotaped confession at trial and provided testimony regarding his earlier statements to police and the ASA.

6

1-09-0657

The motion to suppress and defendant's videotaped confession therefore were matters in the trial record, such that defendant could have raised the present claim on direct appeal. See *e.g. People v. Harris*, 389 Ill. App. 3d 107, 134-35 (2009) (direct appeal challenging trial counsel's effectiveness for failure to litigate a motion to quash/suppress); *People v. Velez*, 388 Ill. App. 3d 493, 503-06 (2009) (same).

Nevertheless, the question we now address is whether the allegations in *the petition*, liberally construed and taken as true, are sufficient to invoke relief under the Act. *People v. Coleman*, 183 Ill. 2d 366, 388 (1998). In his petition, defendant also argued that appellate counsel was ineffective for failing to argue trial counsel's ineffectiveness. The doctrine of waiver should not bar consideration of an issue where the alleged waiver stems from incompetency of counsel on appeal. *People v. Coleman*, 168 Ill. 2d 509, 522-23 (1995). Thus, although postconviction appellate counsel has failed to argue ineffective assistance of direct appeal counsel, based on defendant's petition, we proceed in our review. See *Coleman*, 168 Ill. 2d at 522-23.

Claims of ineffective assistance of appellate counsel are evaluated under *Strickland v. Washington*, 466 U.S. 668 (1984), which requires that defendant show both deficient performance by counsel and resultant prejudice. *Coleman*, 168 Ill. 2d at 523. Appellate counsel need not raise every conceivable argument, and counsel's assessment of what to argue will not be questioned unless his judgment was patently erroneous. *Coleman*, 168 Ill. 2d at 523. Unless the underlying issues are meritorious, defendant obviously suffered no prejudice due to appellate counsel's failure to raise the arguments on direct appeal. *Coleman*, 168 Ill. 2d at 523.

Turning to the underlying merits, in order to sustain a claim of ineffectiveness based on

7

1-09-0657

failure to litigate a motion to suppress, a defendant must establish that the motion would have

been granted, thereby assuring a different trial result.    *People v. Bew*, 228 Ill. 2d 122, 128-29

(2008); *Harris*, 389 Ill. App. 3d at 134.

    Defendant contends he has established just that. Defendant contends his motion to

suppress correctly states that he was not given *Miranda* warnings and his statement was

involuntary based on physical and mental abuse by the police.

    Defendant's contentions, however, are contradicted by the trial record. Detective Bor,

Detective Smith, and ASA Mojica all testified that at separate times following defendant's arrest,

they advised him of his *Miranda* rights and, in each instance, he stated he understood them. In

the videotaped statement played at trial, ASA Mojica again advised defendant of his *Miranda*

rights, and he stated he understood each one as she read them. Defendant acknowledged ASA

Mojica was not his attorney, but stated that he wished to make the videotaped statement anyway.

Defendant further stated that the police detectives and ASA had treated him well, providing him

with sustenance, and that he was making the statement freely and voluntarily absent threat or

promise in exchange. Defendant, in fact, elected to praise Detective Smith for treating him fairly

while in custody. Because the record flatly contradicts defendant's claims of abuse, and defendant

has not pointed to any evidence outside the trial record or affidavits in support of his claims, there

is no reason to believe defendant's motion to suppress would have been granted.

    Given this record, we can also presume defense counsel intended to abandon the motion

as part of sound trial strategy. See *Bew*, 228 Ill. 2d at 128; *People v. Harris*, 206 Ill. 2d 293, 303

(2002). This is especially true where counsel successfully argued a motion to suppress evidence

8

SA0034

1-09-0657

seized at the time of defendant's arrest and zealously represented defendant at trial by presenting

the testimony of a number of witnesses involved in the incident on the evening in question.

Because we may presume trial counsel abandoned the motion as part of sound trial

strategy and, most importantly, because defendant's motion had no likelihood of success,

appellate counsel cannot be faulted for failing to argue on direct appeal that trial counsel was

ineffective for not litigating the motion to suppress. Defendant's *Strickland* claim has no arguable

merit, and the circuit court therefore properly dismissed his petition at the first stage of

proceedings.

We affirm the decision of the circuit court of Cook County.

Affirmed.

9

SA0035

STATE OF ILLINOIS
SUPREME COURT

At a Term of the Supreme Court, begun and held in Springfield, on Monday,
the fourteenth day of November, 2011.

Present: Thomas L. Kilbride, Chief Justice
Justice Charles E. Freeman        Justice Robert R. Thomas
Justice Rita B. Garman            Justice Lloyd A. Karmeier
Justice Anne M. Burke             Justice Mary Jane Theis

---

On the thirtieth day of November, 2011, the Supreme Court entered the
following judgment:

No. 113078

| People State of Illinois, | Petition for Leave to Appeal from |
|---|---|
| Respondent | Appellate Court First District |
| v. | 1-09-0657 |
| Roberto Mata, | 02CR9220 |
| Petitioner | |

The Court having considered the Petition for leave to appeal and being fully
advised of the premises, the Petition for leave to appeal is DENIED.

As Clerk of the Supreme Court of the State of Illinois and keeper of the
records, files and Seal thereof, I certify that the foregoing is a true
copy of the final order entered in this case.

IN WITNESS WHEREOF, I have hereunto
subscribed my name and affixed the Seal
of said Court, this fourth day
of January, 2012.

*Carolyn Toff Grosboll*

Clerk,
Supreme Court of the State of Illinois

**SA0036**

## UNITED STATES DISTRICT COURT
### FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 6.3.3
### Eastern Division

Roberto Mata

      Plaintiff,

v.           Case No.: 1:12–cv–01376
           Honorable Andrea R. Wood

       Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Monday, September 21, 2020:

   MINUTE entry before the Honorable Andrea R. Wood: For the reason stated in the accompanying Memorandum Opinion and Order, Petitioner Roberto Mata's petition for a writ of habeas corpus [1], [40], [41] is denied. The Court declines to issue a certificate of appealability, as Petitioner cannot make a substantial showing of the denial of a constitutional right or that reasonable jurists would debate, much less disagree, with this Court's resolution of his claims. Any pending motion is denied as moot. The Clerk is directed enter judgment in favor of the Respondent and against Petitioner. Civil case terminated. Mailed notice (dal, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

**SA0037**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ROBERTO MATA (#R-41813), | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 12-cv-01376 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| CHRISTINE BRANNON, Warden, | ) | |
| Hill Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Petitioner Roberto Mata, a prisoner at Hill Correctional Center proceeding *pro se*,

initiated this petition for a writ of habeas corpus under 28 U.S.C. § 2254 in 2012, challenging his

state court convictions for murder and aggravated battery. The case was subsequently stayed

while Mata exhausted the state court remedies for one of his claims. Following the conclusion of

state court proceedings for that claim and briefing by the parties, Mata's petition is now ripe for

ruling. For the reasons below, the Court denies Mata's amended § 2254 petition and declines to

issue a certificate of appealability.

### I.     BACKGROUND

### A.     Facts[1]

In 2005, Mata was convicted of the first-degree murders of Adrian Padilla and Sander

Mosqueada, and the aggravated battery with a firearm of Edwin Delgado. (Dkt. No. 20-2 at 1)

---

[1] This Court looks to the state appellate court decisions in Mata's direct appeal and two state post-conviction proceedings for the background facts. *See People v. Mata*, No. 1-05-0527 (Ill. App. Ct. 2007) (Dkt. No. 20-2 at 1); *People v. Mata*, 1-09-0657, 2011 WL 9684766 (Ill. App. Ct. 1st Dist. June 17, 2011); *People v. Mata*, 2016 IL App (1st) 122408-U; *see also Hartsfield v. Dorethy*, 949 F.3d 307, 309 n.1 (7th Cir. 2020) ("We take the facts from the Illinois Appellate Court's opinions because they are presumptively correct on habeas review.") (citing 28 U.S.C. § 2254(e)(1)). The state appellate court

SA0038

(*People v. Mata*, No. 1-05-0527 (Ill. App. Ct. 2007)). At trial, Mata did not contest that he shot Padilla, Mosqueada, and Delgado. Instead, he argued that his actions were justified to protect his friend, Reynaldo Mares, who was being beaten. (Dkt. No. 20-2 at 1–2.) Mata also argued, in the alternative, that if his belief in the need to use deadly force was unreasonable, he was guilty of only second-degree murder.[2] (*Id.*)

Delgado, the State's only eyewitness, testified at trial as follows. He claimed that during the early morning hours on March 16, 2002, he, his friend Padilla, and another man (William Rivera) were in Padilla's car drinking beer on the 2000 block of 18th Place on Chicago's southside. (Dkt. No. 20-2 at 2.) The area was in the territory of the Satan Disciples, a street gang to which Padilla and Delgado belonged. (*Id.*) Rivera left the car to go to a party, and Delgado and Padilla left to go home. (*Id.*)

As Delgado and Padilla were walking, Delgado saw two women, followed by two men (Mata and Mares) enter 18th Place from a gangway. (*Id.* at 3.) Mares was wearing a Houston Astros baseball cap with a cracked five-point star. (*Id.*) While the cracked five-point star was a symbol of the Folks Nation, a gang to which the Satan Disciples belonged, an Astros cap was not. (*Id.*) The Astros cap, according to Mares' statement to officers later, was a symbol of the Latin Kings, a rival gang of the Satan Disciples. (*Id.* at 8.)

Delgado testified that Padilla asked Mata and Mares who they were, to which Mares responded "fuck off" and then ran toward Delgado, striking him in the chest. (*Id.* at 3.) Delgado

---

opinion on direct appeal discusses the facts more thoroughly than the other decisions, so this Court draws the background facts mainly from that decision.

[2] Under Illinois law, a defendant may be found guilty of second-degree murder when first-degree murder has been proved beyond a reasonable doubt, and the defendant then proves by a preponderance of the evidence that he was acting under sudden passion from serious provocation or he unreasonably believed that circumstances existed justifying the killing. *See* 720 ILCS 5/9-2(a)(1)-(2).

**SA0039**

was able to pin Mares to the ground. Mares called for help to Mata, who was about eight feet away. (*Id.*) Mata drew a gun and pointed it at Delgado. (*Id.*) Delgado testified that, when he saw the gun, he let go of Mares and began backing away. (*Id.*) Delgado attempted to run away but, before he could do so, he was shot in the buttocks. (*Id.*) He testified that he heard six shots fired at that time, and he saw that Padilla had also been shot. (*Id.*) Still attempting to flee, Delgado and Padilla began running down the middle of the street. While doing so, Delgado fell. (*Id.* at 3–4.) He then saw Mata walk around a parked car and begin firing at another man who Delgado could not see, but who he later learned was Mosqueada. (*Id.* at 4.) According to Delgado, he and Padilla then began running, and Mata shot at both of them. (*Id.*) The shots missed Delgado but hit Padilla, who "fell like a brick." (*Id.*)

Two days after the incident and a day after his arrest, Mata gave a videotaped statement, which the State played at trial. (*Id.* at 5–6.) In the statement, Mata explained that he and his girlfriend, Esmerelda Herrera, went to a housewarming party on March 15, 2018. (*Id.* at 6.) He met several friends there, including Mares, Chad Cruz, and Karina Pinedo. (*Id.*) Mata was carrying a loaded semi-automatic gun at the time. (*Id.*) Two Hispanic men, who nobody knew, arrived at the party, smoked marijuana, and then left. (*Id.*) Soon after, Mata, Herrera, Mares, Pinedo, and Cruz left the party. (*Id.*)

According to Mata's statement, he and Herrera were walking in front of the others when he heard Mares call out. (*Id.*) Mata looked behind him and saw the two men from the party holding Mares by his arms while two other Hispanic men surrounded him. (*Id.*) Mata took out his gun and fired one shot in the direction of the four men, who then backed away from Mares. (*Id.*) Mata said in his statement that, as he was going toward Mares to help him up, he saw one of the men reach toward his pocket. (*Id.*) Believing the man was reaching for a weapon, Mata fired

**SA0040**

five more shots in the direction of the men. (*Id.*) Mata stated that he never actually saw a weapon and none was found on the victims. (*Id.*)

Mata also testified at trial. There, he testified, contrary to his videotaped statement, that Mares was being beaten and kicked by the men. (*Id.* at 7.) He further testified that he fired one shot in the air to stop the men, who backed away but did not leave. (*Id.*) Similar to his videotaped statement, Mata claimed that as he went to assist Mares off the ground, he saw one of the men reach toward his waist, at which time Mata fired his gun several more times. (*Id.*) Mata and Mares then ran to Herrera's car parked nearby. (*Id.*) As they ran, Mata heard gunfire, and after they were in the car, he saw a man running down the street shooting. (*Id.*)

Mares, Herrera, Pinedo, as well as two more people with Mata on the night of the shooting (Sandy Diz and Nicole Bell), testified on Mata's behalf at trial. (*Id.* at 7.) Each stated they left the party together shortly after 2:00 a.m. (*Id.*) Herrera and Mares stated that, after the shooting started, they saw an unknown man running in the street firing a gun. (*Id.*) Both acknowledged on cross-examination, however, that neither of them mentioned the other gunman to officers after the incident. (*Id.* at 8.) Mares additionally identified a photograph of himself taken on March 18, 2002 and acknowledged that the picture showed no visible injuries to his face. (*Id.*)

The jury was instructed on first-degree murder as well as second-degree murder based on an unreasonable belief that deadly force was necessary to protect another. (Dkt. No. 20-1 at 14–15.) The jury convicted Mata of two counts of first-degree murder for Mosqueada's and Padilla's deaths and of aggravated battery with a firearm for the shots fired at Delgado. (Dkt. No. 20-2, at

**SA0041**

7.) Mata was sentenced to two terms of life imprisonment for the murders and a ten-year

consecutive sentence for the aggravated battery. *Id.*

### B.      Direct Appeal

Mata appealed his trial convictions, arguing that his trial attorney was ineffective for

failing to impeach Delgado's testimony about his whereabouts before the shooting, who

instigated the events just before the shooting, how many shots were fired, and the significance of

Mares's Astros cap. (*Id.* at 9.) Mata also argued on appeal that the imposition of two life

sentences and a consecutive ten-year sentence was in error. (*Id.* at 15.) The state appellate court

rejected the ineffective assistance of counsel claims, agreed with Mata's sentencing argument,

and corrected his mittimus so that his sentences all ran concurrently. (*Id.* at 15–16.) Mata did not

file a petition for leave to appeal ("PLA") with the Illinois Supreme Court.

### C.      Mata's Post-Conviction Petition

Mata filed a post-conviction petition, in which he argued that his trial attorney was

ineffective for failing to follow through with a motion to suppress the videotaped statement and

for failing to call William Rivera to testify at trial, and that his counsel on direct appeal was

ineffective for failing to argue these grounds for finding ineffective assistance of trial counsel.[3]

(Dkt. No. 20-3 at 5–6.) The state trial court summarily dismissed the petition at the first stage of

post-conviction review as frivolous or patently without merit. (*Id.* at 6.)

---

[3] Neither Mata's first state post-conviction petition nor the state trial court's dismissal of it is in the record
before this Court. The above description of claims is thus taken from *People v. Mata*, 2011 WL 9684766,
at *3 (Ill. App. Ct. June 17, 2011), and *People v. Mata*, 2016 IL App (1st) 122408-U, ¶ 11. Both decisions
discuss the first post-conviction petition's claims, but neither decision lists all the claims. The Court has,
as best as possible, pieced together the claims from these decisions and from a letter from Mata's state
appellate defender in his first post-conviction case. (Dkt. No. 1-2 at 2.) Although the Rules Governing
§ 2254 Cases direct respondents to supply relevant transcripts and appellate briefs with their answers, *see*
Rule 5(b)–(d), the Rules do not require that post-conviction petitions and trial court rulings regarding
those petitions be included. Nonetheless, when a respondent argues procedural default, as is the case here,
including the post-conviction petition and the trial court's ruling would assist the Court.

**SA0042**

Mata appealed the decision and was appointed counsel for the appeal. The appointed appellate attorney argued only the claim for ineffective assistance of trial counsel based on the abandoned motion to suppress. (Dkt. No. 20-2 at 18–56.) The state appellate court first determined that the claim had been waived under state law because it could have been raised on direct appeal. (Dkt. No. 20-3 at 6–7.) The court then addressed the claim's merits when addressing Mata's claim that his attorney on direct appeal was ineffective for failing to raise the claim, which the court acknowledged was not argued in the post-conviction appellate brief. (*Id.* at 7 ("although postconviction appellate counsel has failed to argue ineffective assistance of direct appeal counsel, based on defendant's [post-conviction] petition, we proceed in our review.").)

With respect to the merits, the state appellate court determined that the voluntariness of Mata's videotaped statement was evident not only from the trial testimony of two police detectives and an assistant state's attorney—all of whom stated that Mata received and waived his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966)—but also from the statement itself. (Dkt. No. 20-3 at 7–9.) According to the state appellate court, the video statement showed that Mata received, stated he understood, and waived each *Miranda* right; he said he was giving his statement voluntarily and not because of any threat or promise; and he said officers had treated him well. (*Id.* at 8.) The state appellate court found "there [wa]s no reason to believe [Mata]'s motion to suppress would have been granted," "presume[d] defense counsel intended to abandon the motion as part of sound trial strategy," and concluded that "appellate counsel c[ould not] be faulted for failing to argue on direct appeal that trial counsel was ineffective." (*Id.* at 8–9.)

**SA0043**

Mata filed a PLA and argued that the appellate court incorrectly applied the state law standard when affirming the trial court's first-stage dismissal of his post-conviction petition. (Dkt. No. 20-3 at 10–23.) The Illinois Supreme Court denied the PLA. (*Id.* at 25.)

### D.     Mata's Successive Post-Conviction Petition

Mata then filed a successive state post-conviction petition arguing: (1) his trial counsel was ineffective for failing to call as a trial witness Rivera, who allegedly saw Mares being beaten; (2) his appellate counsel was ineffective for not arguing the ineffective assistance of trial counsel claim based on the failure to call Rivera; (3) his trial counsel failed to request a jury instruction on second-degree murder under 720 ILCS 5/9-2(a)(1)'s sudden passion element; and (4) evidence existed establishing that Mata was guilty of only second-degree murder under this element, which the State failed to disprove. (Dkt. No. 20-3 at 27–93.) The state trial court denied the petition upon determining that Mata had not met procedural requirements and that his claims were without merit. (*Id.* at 94–102.)

Mata appealed, asserting the ineffective assistance claims about Rivera not being called to testify. (Dkt. No. 42-1.) The state appellate court affirmed the trial court's procedural dismissal of these claims. *People v. Mata*, 2016 IL App (1st) 122408-U. And the Illinois Supreme Court denied Mata's PLA. *People v. Mata*, 60 N.E.3d 879 (Ill. 2016). Mata then filed an amended petition under 28 U.S.C. § 2254 in this Court.

### II.     MATA'S AMENDED § 2254 PETITION

Mata's amended § 2254 petition lists only two grounds for relief; but each ground asserts multiple claims, which the Court numbers below. Ground One focuses on the voluntariness of Mata's videotaped statement and argues:

(1)     his videotaped statement was involuntary (Dkt. No. 41 at 8–15) (Claim One);

**SA0044**

(2)     his arrest was made without probable cause and his video statement given 26-27 hours later was fruit of the illegal arrest (*id.* at 15–21) (Claim Two);

(3)     trial counsel was ineffective for not following through with the motion to suppress the statement (*id.* at 7, 13–15) (Claim Three); and

(4)     counsel on direct appeal was ineffective for not arguing trial counsel's ineffectiveness for abandoning the motion to suppress, and the state appellate court on post-conviction review considered only some factors when determining the statement's voluntariness, contrary to Illinois' standard of review for a trial court's summary dismissal of a post-conviction petition (*id.* at 7–14) (Claim Four).

Ground Two concerns whether trial counsel was ineffective for not calling Rivera to testify at trial and whether Mata should have been found guilty of only second-degree murder, and argues:

(5)     trial counsel was ineffective for not calling Rivera as a trial witness, and appellate counsel was ineffective for failing to assert trial counsel's ineffectiveness on appeal (*id.* at 22–28) (Claim Five); and

(6)     trial evidence—Mata's testimony, his girlfriend's testimony, Rivera's purported testimony, and Dr. Denton's testimony about some victims being shot from the front—supported a defense of sudden passion, and an instruction on this element of second-degree murder should have been given (*id.* at 28–30) (Claim Six).

For the reasons stated below, Claims One, Two, Three, Five, and Six (all but Claim Four) are procedurally defaulted. Claim Four lacks merit under § 2254(d)'s deferential standard of review that this Court must afford the state appellate court's resolution of the claim.

## A.    Procedural Default

A § 2254 claim may be procedurally defaulted in two ways. The first occurs when a prisoner fails to exhaust fully state court remedies for his federal claim and no longer has the ability to do so under the state's procedural laws. *Thomas v. Williams*, 822 F.3d 378, 384 (7th Cir. 2016). Under 28 U.S.C. § 2254(b)(1)(A), state prisoners must "exhaust[] the remedies available in the courts of the State." A prisoner must "give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the

**SA0045**

federal courts," which is accomplished "by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). State courts, like federal courts, must apply constitutional law, and thus "[c]omity . . . dictates that when a prisoner alleges that his . . . state court conviction violates federal law, the state courts should have the first opportunity to review this claim and provide any necessary relief." *Id.* at 844.

The second type of procedural default "comes from the independent and adequate state ground doctrine." *Thomas*, 822 F.3d at 384 (citing *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991)). Federal habeas review is precluded "where the state courts declined to address a petitioner's federal claims because the petitioner did not meet state procedural requirements." *Id.* at 384. "'A state law ground is independent when the court actually relied on the procedural bar as an independent basis for its disposition of the case.'" *Thompkins v. Pfister*, 698 F.3d 976, 986 (7th Cir. 2012) (quoted case omitted). "'A state law ground is adequate when it is a firmly established and regularly followed state practice at the time it is applied.'" *Id.* Again, "principles of comity and federalism dictate" that federal claims denied by state courts because they were not presented pursuant to state laws be considered procedurally defaulted. *Thomas*, 822 F.3d at 384.

### 1.     Failure to Exhaust Claims One, Two, and Six

With respect to the voluntariness of the video statement (Claim One), Mata presented the issue only as part of his claims that trial counsel abandoned the motion to suppress and that appellate counsel failed to argue trial counsel's ineffectiveness. (Dkt. No. 20-3 at 5–6; Dkt. No. 20-2 at 17–56; Dkt. No. 20-3 at 10–24.) Neither on direct appeal nor in his post-conviction appeals did Mata argue the involuntariness of his video statement as its own claim independent

**SA0046**

of his ineffective assistance of counsel claims. "[A]n assertion that one's counsel was ineffective for failing to pursue particular constitutional issues is a claim separate and independent of those issues." *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004); *see also McGhee v. Watson*, 900 F.3d 849, 853 (7th Cir. 2018); *Howard v. O'Sullivan*, 185 F.3d 721, 725 (7th Cir. 1999) (a constitutional claim presented to the state courts only as part of an ineffective assistance of counsel claim does not satisfy § 2254(b)'s exhaustion requirement for the underlying constitutional claim). This Court, like the state appellate court on post-conviction review, may address the voluntariness of the video statement when addressing Mata's ineffective assistance claim (Claim Four). But as its own claim, Mata's contention that his statement was involuntary was not fairly presented to the state courts and is unexhausted.

Claim Two, in which Mata contends that his arrest was illegal and affected the voluntariness of his statement, was not presented in any of his state court appeals—either on direct or post-conviction review. (Dkt. No. 20-1 at 1–43; Dkt. No. 20-2 at 17–56; Dkt. No. 20-3 at 10–24; Dkt. No. 42-1.) This claim is thus unexhausted as well.

Claim Six—that Mata's jury should have received a jury instruction on Illinois's second-degree murder, sudden-passion element and that the State failed to prove the absence of such a defense—was argued in his successive post-conviction petition, but not in his successive post-conviction appeals. (*See* Dkt. No. 42-1.) The claim was not presented at every level of state court review and is also unexhausted.

Bringing these claims now in another successive post-conviction petition to exhaust state remedies, like the successive petition already attempted, would result in the claims' dismissal on procedural grounds. Claims One, Two, and Six are thus unexhausted and procedurally defaulted.

10

**SA0047**

**2.      Independent and Adequate State Law Ground for Claim Three**

Claim Three, which asserts that Mata's trial counsel was ineffective for abandoning the

motion to suppress as its own claim separate from the claim that appellate counsel was

ineffective for failing to assert it, is also procedurally defaulted for a different reason.

The state appellate court in Mata's first post-conviction appeal determined that the claim

was procedurally barred because "[t]he motion to suppress and defendant's videotaped

confession . . . were matters in the trial record, such that [Mata] could have raised the [ineffective

assistance of trial counsel] claim on direct appeal." (Dkt. No. 20-3 at 7.) "Failure to raise a claim

which could have been addressed on direct appeal is a procedural default which results in a bar

to consideration of the claim's merits in a post-conviction proceeding." *Sturgeon v. Chandler*,

552 F.3d 604, 611 (7th Cir. 2009) (quoting *People v. Erickson*, 641 N.E.2d 455, 458 (Ill. 1994)).

"A finding of waiver by the state postconviction court is enough to establish an adequate and

independent state ground." *Sturgeon*, 552 F.3d at 611 (citing *Daniels v. Knight*, 476 F.3d 426,

431 (7th Cir.2007); *see also Krol v. Calhoun*, No. 16 CV 11595, 2019 WL 5592757, at *11

(N.D. Ill. Oct. 30, 2019).[4]

Even though the state appellate court went on to consider the merits of the ineffective

effective assistance of trial counsel claim in the context of the ineffective assistance of appellate

counsel claim (as will this Court), it is clear that the state appellate court relied on Illinois's

waiver rule as a ground for denying the claim. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989)

("a state court need not fear reaching the merits of a federal claim in an alternative holding");

---

[4] This Court notes Mata's contention in his § 2254 petition that several factors relating to the
voluntariness of the statement were not in the trial court record, suggesting that he could not have raised
his ineffective assistance claim until his post-conviction petition. (Dkt. No. 41 at 12–15.) But the state
courts determined that this claim could have been raised on direct appeal and was thus waived under state
law. (Dkt. No. 20-3 at 6–7.) "[I]t is not the province of a federal habeas court to reexamine state-court
determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).

**SA0048**

*Bivens v. Rednour*, 428 Fed. Appx. 638, 642 (7th Cir. 2011) (where state courts dismiss a federal claim on procedural grounds and then addresses the merits in the alternative, "we still honor the adequate and independent determination"). Claim Three is thus procedurally defaulted.

### 3.    Independent and Adequate State Law Ground for Claim Five

Claim Five—regarding trial counsel not calling Rivera to testify and appellate counsel not arguing trial counsel's ineffectiveness—according to the state appellate court in Mata's successive post-conviction appeal, was not presented in accordance with Illinois's procedural rules. Although Mata argued this claim in his first post-conviction petition, he did not raise the claim in his post-conviction appeal. And his successive post-conviction petition, according to the state appellate court, asserted no grounds to excuse Illinois's procedural default. *See Mata*, 2016 IL App (1st) 122408-U, ¶¶ 18-21.

The failure to satisfy "[t]he state procedural rule" setting forth the requirements for bringing a successive state post-conviction petition, 725 ILCS 5/122–1(f), "is an adequate and independent state ground precluding federal habeas review of [Mata's] claim raised in his second state petition." *Thomas*, 822 F.3d at 385; *see also Chapman v. Jones*, No. 17 C 9190, 2020 WL 3892986, at *7 (N.D. Ill. July 10, 2020). Claim Five is procedurally defaulted.

### 4.    Presence of Cause and Prejudice or a Fundamental Miscarriage of Justice

For the above-stated reasons, Claims One, Two, Three, Five, and Six are procedurally defaulted. Federal habeas review of those claims "is barred unless [Mata] can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of

**SA0049**

justice." *Coleman*, 501 U.S. at 750; *see also House v. Bell*, 547 U.S. 518, 536 (2006). Mata

demonstrates neither exception.

Mata contends that the ineffectiveness of his attorneys in his post-conviction proceedings

caused the procedural defaults. (Dkt. No. 53 at 4–6.) Ineffective assistance of post-conviction

counsel, however, does not satisfy the cause requirement in Illinois. While post-conviction

counsel's ineffectiveness can amount to cause to excuse a procedural default in some cases, such

occurs only in states that either prevent or discourage ineffective assistance claims on direct

appeal. *Crutchfield v. Dennison*, 910 F.3d 968, 973 (7th Cir. 2018) (addressing the exceptions

recognized by the Supreme Court in *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*,

569 U.S. 413 (2013)). As explained by the Seventh Circuit, "Illinois law gives prisoners a

meaningful opportunity to litigate claims of ineffective assistance of trial counsel on direct

review." *Crutchfield*, 910 F.3d at 978. Thus, the *Martinez/Trevino* exception allowing for

ineffective assistance of post-conviction counsel to serve as cause for a procedurally defaulted

ineffective assistance of trial counsel claim does not "extend . . . to Illinois prisoners." *Id.*

Nor has Mata shown that a fundamental miscarriage of justice would occur if his

defaulted clams are not reviewed on the merits. This exception is reserved for the "exceptional

case" where "a constitutional violation has probably resulted in the conviction of one who is

actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (quoting *Murray v. Carrier*, 477

U.S. 478, 496 (1986)). "[T]he petitioner [must] make a convincing showing of actual

innocence." *Jones v. Calloway*, 842 F.3d 454, 461 (7th Cir. 2016). He "must have 'new reliable

evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or

critical physical evidence—that was not presented at trial' . . . and must persuade the district

court that it is 'more likely than not that no reasonable juror would have convicted him in light of

13

**SA0050**

the new evidence.'" *Id.* (quoting *Schlup*, 513 U.S. at 324, 327). Mata points to no new reliable

evidence not presented at trial demonstrating that he is actually innocent.

Accordingly, all but one of Mata's claims are procedurally defaulted because the claims

either were not presented in one full round of state court review or were dismissed on

independent and adequate state law grounds. Mata has not demonstrated cause and prejudice or

actual innocence as necessary to excuse the defaults. Claims One, Two, Three, Five, and Six are

thus denied.

### B.    Merits of Claim Four

Mata's claim that his attorney on direct appeal was ineffective for failing to argue his trial

counsel's ineffectiveness for abandoning the motion to suppress the video statement was not

dismissed on procedural grounds and was addressed on the merits by the state post-conviction

appellate court.[5] (Dkt. No. 20-3 at 7–9.) This claim, however, warrants no § 2254 relief.

Federal habeas relief is available for federal claims addressed on the merits by a state

court only if Mata demonstrates that the state court's resolution of the claim:

(1)    resulted in a decision that was contrary to, or involved an unreasonable
        application of, clearly established Federal law, as determined by the
        Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of
        the facts in light of the evidence presented in the State court proceeding.

---

[5] Most of the amended § 2254 petition's discussion of this issue contends that the state appellate court
erroneously applied Illinois's review standard for a trial court's dismissal of a post-conviction petition at
the first stage. But as previously stated several times in this opinion, this Court reviews only
constitutional issues and does not reexamine state courts' application of state law. Though focusing on
state law, the amended § 2254 petition seeks federal habeas review of the state appellate court decision
wherein the only claim addressed on the merits was the ineffective assistance of appellate counsel claim.
(Dkt. No. 20-3 at 7–9.) To the extent the amended petition may be liberally construed as asserting a
constitutional claim of ineffective assistance of appellate counsel, which Mata asserted in his original
§ 2254 petition (Dkt. No. 1 at 5), this Court so construes and addresses this claim.

28 U.S.C. § 2254(d). "A state-court decision is contrary to clearly established federal law 'if it applies a rule that contradicts the governing law set forth' in Supreme Court decisions or 'confronts a set of facts that is materially indistinguishable from' a Supreme Court decision but comes out differently." *Valle v. Butler*, 707 Fed. Appx. 391, 398 (7th Cir. 2017) (quoting *Brown v. Payton*, 544 U.S. 133, 141 (2005)). For a state court's application of federal law to be unreasonable, it must be "more than incorrect; it must have been objectively unreasonable." *Felton v. Bartow*, 926 F.3d 451, 464 (7th Cir. 2019) (citing *Wiggins v. Smith*, 539 U.S. 510, 520 (2003)). "'Unreasonable' in [this] context . . . means something . . . lying well outside the boundaries of permissible differences of opinion." *McGhee v. Dittmann*, 794 F.3d 761, 769 (7th Cir. 2015) (quoting *Corcoran v. Neal*, 783 F.3d 676, 683 (7th Cir. 2015)). As long as this Court is "satisfied that the [state appellate court] took the constitutional standard seriously and produce[d] an answer within the range of defensible positions, we will affirm the district court's decision to deny the writ." *Felton*, 926 F.3d at 464. "The petitioner bears the burden of showing that the state court's decision was unreasonable.'" *Valle*, 707 Fed. Appx. at 398 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

With respect to Mata's ineffective assistance of appellate counsel claim, the state appellate court cited the familiar two-prong test from *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984). The state court stated that Mata had to "show both deficient performance by counsel and resultant prejudice." (Dkt. No. 20-3 at 7.) The state court further noted that "[a]ppellate counsel need not raise every conceivable argument, and counsel's assessment of what to argue will not be questioned unless his judgment was patently erroneous," and that "[u]nless the underlying issues are meritorious, defendant obviously suffered no prejudice due to appellate counsel's failure to raise the arguments on appeal." (*Id.*)

**SA0052**

This Court concludes that the state appellate court followed the correct legal standards. "The general *Strickland* standard governs claims of ineffective assistance of appellate counsel as well as trial counsel." *Makiel v. Butler*, 782 F.3d 882, 897 (7th Cir. 2015). To establish such a claim, a petitioner must show that: (1) his appellate attorney's performance was constitutionally deficient, *i.e.*, "that his counsel was objectively unreasonable," and (2) the deficient performance prejudiced the petitioner's appeal, *i.e.*, a reasonable probability exists "that, but for his counsel's unreasonable failure to [raise a claim], he would have prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 285–86 (2000) (citing *Strickland*, 466 U.S. at 687–91, 694). "Appellate counsel is not required to present every non-frivolous claim on behalf of her client." *Makiel*, 782 F.3d at 897. "[A]ppellate counsel's performance is deficient under *Strickland* only if she fails to argue an issue that is both 'obvious' and 'clearly stronger' than the issues actually raised." *Id.* "Failure to raise a losing argument, whether at trial or on appeal, does not constitute ineffective assistance of counsel." *Stone v. Farley*, 86 F.3d 712, 717 (7th Cir. 1996) (citing *Strickland*, 466 U.S. at 687).

Addressing the merits of Mata's ineffective assistance of appellate counsel claim, the state appellate court explained as follows:

> Turning to the underlying merits, in order to sustain a claim of ineffectiveness based on failure to litigate a motion to suppress, a defendant must establish that the motion would have been granted, thereby assuring a different trial result. (citations omitted).
>
> Defendant contends he has established just that. Defendant contends his motion to suppress correctly states that he was not given *Miranda* warnings and his statement was involuntary based on physical and mental abuse by the police.
>
> Defendant's contentions, however, are contradicted by the trial record. Detective Bor, Detective Smith, and [Assistant State's Attorney] Mojica all testified that at separate times following defendant's arrest, they advised him of his *Miranda* rights and, in each instance, he stated he understood them. In the videotaped statement played at trial, [Assistant State's Attorney] Mojica again

16

**SA0053**

advised defendant of his *Miranda* rights, and he stated he understood each one as she read them. Defendant acknowledged [Assistant State's Attorney] Mojica was not his attorney, but stated that he wished to make the videotaped statement anyway. Defendant further stated that the police detectives and [Assistant State's Attorney] had treated him well, providing him with sustenance, and that he was making the statement freely and voluntarily absent threat or promise in exchange. Defendant, in fact, elected to praise Detective Smith for treating him fairly while in custody. Because the record flatly contradicts defendant's claims of abuse, and defendant has not pointed to any evidence outside the trial record or affidavits in support of his claims, there is no reason to believe defendant's motion to suppress would have been granted.

Given this record, we can also presume defense counsel intended to abandon the motion as part of sound trial strategy. (citations omitted) This is especially true where counsel successfully argued a motion to suppress evidence seized at the time of defendant's arrest and zealously represented defendant at trial by presenting the testimony of a number of witnesses involved in the incident on the evening in question.

Because we may presume trial counsel abandoned the motion as part of sound trial strategy and, most importantly, because defendant's motion had no likelihood of success, appellate counsel cannot be faulted for failing to argue on direct appeal that trial counsel was ineffective for not litigating the motion to suppress. Defendant's *Strickland* claim has no arguable merit, and the circuit court therefore properly dismissed his petition at the first stage of proceedings.

(Dkt. No. 20-3 at 7–9.)

Mata does not contest the state appellate court's description of what he said in the statement. Instead, he contends the state court did not consider all the factors, such as police officers' physical and mental abuse of Mata before his statement. (Dkt. No. 41 at 7–15.) According to Mata, officers threw him against a wall, dragged him down stairs, pushed him, and threatened that his fiancé would be arrested and the Department of Child and Family Services would be contacted to take his daughter if he did not give a statement. (*Id.* at 8–10.) He further states that he was handcuffed to a wall in a small room during much of the time before his video statement, was sleep deprived, and was not read his *Miranda* rights during every interrogation between the time of his arrest and the statement. (*Id.* at 9–11.) He contends that "[g]iven these

17

**SA0054**

facts that transpired prior to and leading up to the making of Mata's oral/video statement, it can be inferred that he was in fact coerced by Chicago detectives." (*Id.* at 11.) According to Mata, the state appellate court did not consider all factors when determining that the motion to suppress the statement was a meritless motion his trial attorney chose not to pursue. (*Id.* at 12–14.)

When determining the voluntariness of a statement, a court must "evaluate the 'totality of the circumstances' surrounding it." *Carter v. Thompson*, 690 F.3d 837, 843 (7th Cir. 2012) (quoting *Schneckloth v Bustamonte*, 412 U.S. 218, 226 (1973) (noting various factors to consider)). Some factors weigh more than others in each case, but ultimately the voluntariness inquiry asks whether the statement is "the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *United States v. Stewart*, 536 F.3d 714, 723 (7th Cir. 2008) (internal quotes and citations omitted).

Prior to the above-quoted discussion about Mata's videotaped statement, the state appellate court noted factors listed in his motion to suppress: "he stated that he was held by police for two days without *Miranda* warnings; he was 'poked and profaned,' kept in solitary confinement, forced to stand handcuffed to cell walls for hours, and threatened by police officers." (Dkt. No. 20-3 at 2); *see also* (Dkt. No. 20-2 at 39–40). That the state appellate court focused on the video statement itself when ultimately deciding it was voluntary does not mean the court did not consider other factors. Given the evidence in the record—testimony from two police detectives and an Assistant State's Attorney to the effect that Mata understood his *Miranda* rights, waived them, and wanted to make the statement, and the video statement itself, wherein Mata stated he understood and waived each *Miranda* warning and that he was voluntarily giving the statement free of threats and promises—the state appellate court's

18

**SA0055**

determination that the motion to suppress was meritless and would not have succeeded was not unreasonable.

Nor was the state appellate court unreasonable when it determined that trial counsel presumably abandoned the motion to suppress as part of sound trial strategy. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). As the state appellate court noted, Mata's trial attorney successfully litigated a motion to suppress evidence from a search conducted at the time of Mata's arrest and "zealously represented [him] at trial by presenting the testimony of a number of witnesses" to the shooting incident. (Dkt. No. 20-3 at 8–9); *see also* (Dkt. 20-2 at 7–8) (on direct appeal, the state appellate court listed five fact witnesses, other than Mata, called to testify on his behalf); *see also Carter v. Duncan*, 819 F.3d 931, 950 (7th Cir. 2016) (Easterbrook, concurring) ("*Strickland* directs a court to examine the totality of counsel's performance, not to concentrate on a supposed error while losing sight of what the lawyer **did** for his client.") (emphasis in original).

Considering the abundance of evidence demonstrating that Mata voluntarily gave his video statement, this Court cannot conclude that the state appellate court's determinations—that a motion to suppress the statement would not have succeeded, that trial counsel presumably abandoned the motion, and that appellate counsel was not ineffective for failing to argue ineffective assistance of trial counsel with respect to the motion—were unreasonable. Mata has not made the requisite showing under § 2254(d) to warrant federal habeas relief for this claim. For this reason, Claim Four is without merit and denied.

**SA0056**

### III.     CONCLUSION

For the reasons stated above, none of Mata's claims warrant relief under § 2254 and his petitions for federal habeas corpus relief (Dkt. Nos. 1, 40, 41) are denied. The Court declines to issue a certificate of appealability, as Mata cannot make a substantial showing of the denial of a constitutional right or that reasonable jurists would debate, much less disagree, with this Court's resolution of his claims. *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (citing 28 U.S.C. § 2253(c)(2)); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Any pending motion is denied as moot. The Clerk is directed enter judgment in favor of the respondent and against Mata.

Mata is advised that this is a final decision ending his case in this Court. If he wishes to appeal, he must file a notice of appeal in this Court within 30 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). He need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. However, if he wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). A Rule 59(e) motion must be filed within 28 days of the entry of judgment, *see* Fed. R. Civ. P. 59(e), and suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). A Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi). Neither the time to file a Rule 59(e) motion nor the time to file a Rule 60(b) motion can be extended. *See* Fed. R. Civ. P. 6(b)(2).

**SA0057**

ENTERED:

_____

Andrea R. Wood
United States District Judge

Date: September 21, 2020

**SA0058**

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

March 11, 2021

**Before**

THOMAS L. KIRSCH II, *Circuit Judge*

No. 20-3151

| | |
|---|---|
| ROBERTO MATA,<br>*Petitioner-Appellant*, | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. |
| *v.* | No. 12-cv-01376 |
| CHRISTINE BRANNON-DORTCH,<br>*Respondent-Appellee.* | Andrea R. Wood,<br>*Judge.* |

## O R D E R

The district court denied Roberto Mata's petition for a writ of habeas corpus under 28 U.S.C. § 2254. After reviewing the district court's final order and the record on appeal, we find that reasonable jurists could debate whether Mata procedurally defaulted his claim that his trial attorney was ineffective for failing to demand a hearing on Mata's motion to suppress his videotaped confession. Specifically, the parties should address the state court's holding that Mata needed to raise his claim on direct appeal, rather than saving it for postconviction review. To the extent that Mata's claim relies on facts not developed in the trial record, there is room to debate whether applying Illinois's direct-appeal rule here amounted to an adequate and independent state-law ground of decision. As for the underlying constitutional claim, Mata has made a substantial showing of the denial of his right to effective assistance of counsel under the Sixth Amendment. *See* 28 U.S.C. § 2253(c)(2).

Accordingly, we **GRANT** Mata's request for a certificate of appealability and his motion to appoint counsel. An order designating counsel and setting a briefing schedule will follow.

**SA0059**